**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD H. SATERSTAD, | : | CIVIL NO: 4:13-CV-00847 |
| | : | |
| Petitioner, | : | (Judge Brann) |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| TREVOR WINGARD, | : | |
| | : | |
| Respondent | : | |

## REPORT AND RECOMMENDATION

### I. Introduction.

In 2003, the petitioner, Edward H. Saterstad, was convicted in the Court of Common Pleas of Dauphin County of attempted luring of a child into a motor vehicle, attempted kidnapping, and stalking. He was sentenced to an aggregate term of two to ten years in prison. In this habeas corpus case, Saterstad claims that his counsel provided ineffective assistance of counsel during his state criminal trial. He also claims that there was not sufficient evidence to convict him. For the reasons discussed below, we recommend that the petition for a writ of habeas corpus be denied.

## II.  Background and Procedural History.

### A.  The Trial.

Because we address some of Saterstad's claims on the merits, including sufficiency-of-the-evidence and ineffective-assistance-of-counsel claims, we take the time at the outset to summarize the trial testimony in some detail.  Although the events underlying the charges occurred in February of 2001, Saterstad was not tried until September of 2003.  At trial, Saterstad was represented by Joshua Lock, Esquire.  The Honorable Richard A. Lewis presided over the jury trial.

### 1. The Prosection's Case-In-Chief.

Four witnesses testified during the prosecution's case-in-chief.  First, S.C.,[1] who was thirteen years old at the time of trial, testified that she lived with her grandmother on 6th and Maclay Streets in Harrisburg. *Doc. 23-3* at 18.  She testified that on February 1, 2001, when she was ten, nearly eleven, years old, she spoke to the police because a man was following her around. *Id.* at 19.  She testified that the first time that she saw the man was when she was walking to the corner store to get a stamp for her grandmother and he pulled up beside her in his car and asked her where a certain street was. *Id.* at 19 & 33.  According to S.C.,

---

[1] At the time of trial in 2003, S.C. was a minor.  Although she is no longer a minor and the record contains her full name, the parties in their briefs continue to refer to her by her initials, and we will do the same.

after she said that she did not know, the man said he would give her $200 if she would go across the river with him for 30 minutes to fool around. *Id.* at 20.  S.C. ran to the store. *Id.*  She testified that she then returned to her grandmother's house, but did not tell her grandmother what had happened. *Id.*

S.C. testified that later that same day she went back outside, and she saw the man again driving around in the parking lot of her apartment complex. *Id.* at 20-21. He did not say anything to her. *Id.* at 21-22.  He was driving a gray Metro, the same car that he had been driving when he approached her earlier. *Id.* at 21.  S.C. described the man as white, with gray and black hair, and wearing round glasses with black frames. *Id.*

S.C. testified that she saw the man again the next day when she was with her friend A.M.[2] *Id.* at 22.  At that time, she and A.M. were walking to the Chinese restaurant near her home when they saw the man standing on the corner. *Id.* According to S.C., when the man saw them, he said wait a minute and ran toward his car, which was at the gas station. *Id.*  S.C. and A.M. then ran to A.M.'s apartment building. *Id.* at 23.  Later that same day, when S.C., her cousin, and A.M., were outside playing, the man was driving around the apartment complex parking lot again—in the same gray Metro. *Id.* at 23.

---

[2] As A.M. was also a minor at the time of trial, we will also use her initials, instead of her full name.

S.C. testified that she saw the man again the following day in the gray car driving past her bus stop. *Id.* at 24.  Later that day, she saw him again driving around her house. *Id.*  According to S.C., she was scared that he was going to get her, and so she told her grandmother. *Id.* at 25.  S.C. testified that her grandmother called the police and then she and her grandmother went to look for the man. *Id.* at 25.  He was in the plaza near the Chinese restaurant in the gray Metro. *Id.* at 26.  S.C. testified that when her grandmother approached the man, he rolled up his window and sped off. *Id.*  But her grandmother got his license plate number. *Id.*  S.C. and her grandmother then went back to the house, and the police came. *Id.*

S.C. testified that she spoke to a police officer that night, that she spoke with Investigator Shoeman about a week later at her house, and that later she went up to a taxi cab that Investigator Shoeman was in and told Shoeman that she had again seen the man driving around her house. *Id.* at 26-28.  S.C. also testified that investigator Shoeman showed her some photos and she picked out the photo of the man that was following her around. *Id.* at 28.  At trial, S.C. identified a photo of the gray car that the man had been driving as well as a photo of a red van that S.C. testified she had also seen the man driving. *Id.* at 32-33.  When asked in court if she saw the man who had followed her around and had offered her $200 to go across the river and fool around, she pointed to Saterstad. *Id.* at 34.

On cross-examination, S.C. testified that when she talked to the police on February 1, 2001, she truthfully told them everything she knew about the incident and that she told them about events that had happened that day. *Id.* at 35. According to S.C.'s testimony on cross-examination, she did not tell her grandmother on the day that the man approached her, but she told her grandmother on the second day—February 2, 2001. *Id.* at 37.  S.C. testified that when she told her grandmother, she told her that some man was following her around and she told her what the man had said. *Id.* at 41-42.  She further testified that she reported this to her grandmother on the day that the police came to her house, and she believed that to be the day after the man spoke to her. *Id.*  Although the plaza near S.C.'s home, which is where the Chinese restaurant was located, also contained a Harrisburg Police Department substation, S.C. did not go to the police station in the plaza when the man approached her or when she saw him driving around. *Id.* at 38.

S.C. testified that A.M. was not with her when the man approached her and that she did not tell the police that A.M. was with her. *Id.* at 35-36.  S.C. also denied telling A.M. in December of 2000 that a man driving a gray car had approached her and offered her $200 to go across the river and fool around. *Id.* at 38-39.

S.C. testified that she told the police that the man was wearing all black—black boots, black jeans, a black leather jacket, and black-framed glasses. *Id.* at 39. When asked how she saw his boots, S.C. testified that she saw them when he was standing out of his car by the Chinese restaurant. *Id.* at 39-40.  She testified that she gave the description of the man to the police on the day that the police came to her home and that when she talked to the police she described for them what had occurred the day before when the man approached her in the car, but she did not see his boots then. *Id.* at 40.  She then testified that when she spoke to the police for the first time, she also described for them another incident when the man was standing outside of his car. *Id.* at 41.

S.C. testified that she also saw the man when she was walking to the bus stop with A.M. and other kids, but, when she got on the school bus, she did not tell the school bus driver or her friends. *Id.* at 42-43.  She also testified that she told her grandmother she saw the man driving past the bus stop, and that was the second time she told her grandmother about the man. *Id.* at 43.

S.C. responded affirmatively to defense counsel's question about whether the events occurred on three successive days. *Id.* at 44.  She also testified that when the man approached her and talked to her it was at night, but she could not remember telling anyone that it was either 4:00 p.m. or 5:30 p.m. *Id.* at 44-45.  She further testified that she saw the red van driving past her house at about 4:00 p.m.

later in the same day that she had seen the man drive past her bus stop, which she agreed was the third day. *Id.* at 45. She said she saw the red van in the morning and then in the afternoon. *Id.* at 46.

When asked if she had a good recollection of what happened, S.C. said "yes," but after defense counsel noted that she hestitated a bit, Judge Lewis asked her if she had a good memory of what happened in February of 2001 and she said that that she remembers "some stuff." *Id.* at 47. She also then responded in the negative to defense counsel's question about whether there was anything that she testified to that she doesn't have a clear memory of or that may be incorrect. *Id.*

S.C. also testified that she remembered testifying at a preliminary hearing, and when shown the transcript from the preliminary hearing, she testified that at the preliminary hearing she was asked if she saw the car and the red van on the same day and that she had answered that she had not. *Id.* at 47-50.

The second witness to testify was S.C.'s friend, A.M., who at the time of trial was also 13 years old. *Doc. 23-3* at 51. A.M. testified that in February of 2001, she was riding her bike and saw someone in a gray Metro driving through the parking lot of her apartment complex, and when S.C. came out, A.M. told her that someone keeps driving around. *Id.* at 53. According to A.M., S.C. then told her that the man in the car had followed her when she was going to the store to get a stamp for her grandmother and had asked her if she wanted to go across the river

to make $200. *Id.*  A.M. testified that S.C. did not tell her about the man on the day that the man approached her, but S.C. told her the next day. *Id.* at 52.  A.M. identified a photo of a gray Metro that she saw driving around, and she described the person driving it as white with black-framed glasses and a black leather coat. *Id.* at 53-54.

A.M. further testified that on the same day that she saw the man driving through the parking lot, she saw him when she was going to the Chinese restaurant. *Id.* at 54.  According to A.M., he was standing, and when he saw her and S.C., he ran over to get his gray Metro, which was at the Exxon station. *Id.*  A.M. testified that she and S.C. then ran back to the parking lot of her apartment complex and went into A.M.'s house. *Id.* at 54-55.  According to A.M., when they came back out, they saw the man driving around the parking lot, they saw him on Peffer Street, and they saw him in the plaza. *Id.* at 55.

A.M. testified that she was with S.C. when S.C. told her grandmother about the man, and she was there when the police came. *Id.* at 55-56.  She also testified that she saw the man riding around in a red van. *Id.* at 56.  More specifically, she said she saw him on a Saturday, two days after she spoke with the police, when she just happened to look out her window and saw him coming down Maclay Street in a red van. *Id.*  She testified that she saw his black-framed glasses and leather coat.

*Id.* When asked if she saw the man any other times, she testified that she does not remember much. *Id.* at 57.

On cross-examination, A.M. testified that on the day that she saw the red van, nobody was with her. *Id.* at 57. A.M. denied that it was around Christmas of 2000 that S.C. told her that a man had approached her, offered her $200, and asked if she wanted to go across the river. *Id.* at 58.

A.M. further testified the she did not remember the first day that she saw the car driving around the neighborhood and that the only thing that she knows about dates and times when S.C. saw the car was what S.C. told her. *Id.* at 62. She also testified that she believed that S.C. told her about the man the second time that S.C. saw the car driving around and at that time, S.C. told her about what happened earlier when the man had spoken to her. *Id.* At one point, A.M. testified that she could not remember when that occurred. *Id.* Right after that, however, she testified that she had a specific recollection that it was February of 2001, and she knows that because they spoke to the police on February 1st. *Id.* at 63. When pressed about how she knows it was February 1st, A.M. gave confusing and conflicting answers. *Id.* at 63-65. She testified that she does not know how she knows, but she also testified that she knows it was February 1st because someone told her. *Id.* at 63. When asked if she was in the courtroom when S.C. testified that it was February 1st, she admitted that she was and that she had heard S.C. say that it was

February 1st. *Id.* at 63-64.  But she testified that she did not say it was February 1st

because S.C. said it was, and she knew it was February 1st before S.C. testified. *Id.*

at 64.  When pressed further, however, A.M. testified that she said it was February

1st because she heard S.C. testify to that, but then she seemed to backtrack from

that statement:

> Q:  The truth of the matter is you're telling [us] it was
> February first because you heard your friend say it was
> February first, isn't that right?
> A:  Yes.
> Q:  When you said that wasn't the reason, you really
> weren't telling us the truth, were you?
> A:  Yes.
> Q:  I beg your pardon?
> A:  Yes, I was telling you the truth.
> Q:  Well, you denied telling us because you heard your
> friend say it.  You said that you remembered, you just didn't
> know how.  Now you are telling us you said it because your
> friend said it.  Which is it?
> A:  Yes.
> Q:  Yes what?  There is two choices, number one or
> number two?
> A:  Number one.
> Q:  What is number one?
> A:  I don't remember.

*Doc. 23-3* at 65.

A.M. further testified that she saw the man standing outside his car when she

was going to the plaza, that he was standing by the Chinese restaurant, and that

when he saw her and S.C., he ran over to his car. *Id.* at 66.  She testified that it was

dark outside, but there were some street and store lights. *Id.* at 67.  She also

testified that she suggested that they tell S.C.'s grandmother, but before going to tell S.C.'s grandmother, they went to S.C.'s cousin's house for about five minutes. *Id.* at 67-69.  A.M. testified that she doesn't remember how many times she saw the gray car, but it was a lot. *Id.* at 69.  She also testified that she could not remember the dates that she saw the car. *Id.* at 70.  She further testified that she saw the gray car, not the red van, on the way to the bus stop with S.C. *Id.* at 71.

Sharon Edwards, S.C.'s grandmother and legal guardian, also testified. *Doc. 23-3* at 73-74.  She testified that she called the police on February 1, 2001 after S.C. told her that a man was following her. *Id.* at 74.  When Edwards asked S.C. where the man was, S.C. said he keeps coming around the corner. *Id.*  According to Edwards, she got a pencil and a pad, asked S.C. which way the man went, and after S.C. said he went around the corner and pointed to the plaza, she, S.C., and A.M. ran around the corner. *Id.*  S.C. pointed out a car sitting in front of the Chinese restaurant, and Edwards approached the car and said "excuse me, sir, excuse me," and "may I speak with you for minute?" *Id.* at 75.  When the man noticed S.C., he turned the lights on in his car, pulled off, and sped past Edwards, S.C., and A.M. *Id.* at 75.  Edwards ran behind the car, and when the car had to stop at an intersection, she took down his license plate number. *Id.*  The car then sped away, and Edward ran home and called the police. *Id.*

At trial, Edwards identified photographs of the car that she saw and from which she got the license plate number. *Id.* at 76-77.  She further testified that Investigator Shoeman showed her a series of photographs, and she was able to pick out the person that she saw that night in front of the Chinese restaurant in the Metro. *Id.* at 78-79.  When asked if she saw that man in court, she pointed to Saterstad. *Id.* at 79.

On cross-examination, Edwards testified that earlier in the day that S.C. told her that the man was following her, Edwards had sent S.C. to the store. *Id.* at 80. According to Edwards, she called the police the same day that S.C. reported the incident to her, and that day was February 1, 2001. *Id.* at 80-81.  Edwards  also testified that in addition to talking to the police on February 1, 2001, she talked to them on February 11, 2001, which was the day that S.C. told her that she had seen a red van. *Id.* at 81.

The final witness to testify in the prosecution's case-in-chief, was Rodney Shoeman, an investigator with the Harrisburg Bureau of Police and the person who filed the charges against Saterstad. *Doc. 23-3* at 82-83.  Shoeman testified that after he reviewed the case and initiated a report on February 10, 2001, he contacted Sharon Edwards to set up an interview with her and S.C., and they came to his office the next day and gave statements. *Id.* at 90.  On or about February 12, 2001, he and another investigator drove around the area in question looking for the

suspect vehicle. *Id.* at 83 & 90.  Then, on February 13, 2001, Shoeman and the

other investigator did some surveillance of Saterstad's residence. *Id.* at 90.  Later

on the 13th, Shoeman was doing some surveillance from a taxi, when S.C.

approached him and said that she had again seen the man in the gray car. *Id.* at 83-

84 & 91.

Shoeman testified that after the license plate number that Sharon Edwards

provided came back as registered to Saterstad, he got Saterstad's driver's license

photo from PennDOT. *Id.* at 85 & 91.  He compiled a photo array by taking that

photo to the forensics' unit, which scanned it and provided computer-generated

photos similar to Saterstad's photo. *Id.* at 85.  Shoeman then went to S.C.'s home

on February 14, 2001, and showed her the photo array, while her grandmother was

upstairs in a separate room. *Id.* at 85-86.  S.C. immediately recognized Saterstad

and said "that's him." *Id.* at 85.  After she initialed and dated the photo, Shoeman

put that photo array aside. *Id.*  He then showed a similar photo array to S.C.'s

grandmother, who also picked out a photo but said that when she saw the man he

was wearing glasses. *Id.* at 85.  Shoeman then spoke with the District Attorney's

Office regarding filing charges against Saterstad. *Id.* at 91.

Shoeman identified at trial a photograph taken on February 13, 2001, of a

maroon Plymouth Voyager parked in front of Saterstad's residence in Lykens and

and a photograph taken on February 21, 2001, near Elizabethville of a gray Geo

Metro, showing the license plate. *Id.* at 87-88.  Shoeman also identified a

photograph of a jacket that Saterstad was wearing on February 21, 2001. *Id.* at 88.

Based on information from the Department of Transportation, Shoeman testified

that the Gray Geo Metro was registered to Saterstad and the van was registered to

Mary A. Saterstad. *Id.* at 89.

### 2. The Defense Case.

After the prosecution's case-in-chief, the defense began its case by calling

seven character witnesses.  The first character witness was James Arnold

Buffington, Jr., who knew Saterstad for at least 15 years primarily through the

Lykens Chamber of Commerce and through contacts with the Upper Dauphin Area

School District, and who testified that Saterstad has an excellent reputation in the

community for being a nonviolent and peaceable person. *Doc. 23-3* at 93-95.  The

second character witness was Richard Klinger, a retired physical education teacher

and track coach with the Upper Dauphin Area School District, who testified that

Saterstad has a reputation for being nonviolent. *Id.* at 97-99.  The third character

witness was Pastor Daniel Moyer Shutters, who knew Saterstad as a member of his

congregation, and who testified that Saterstad has an excellent reputation as a

nonviolent and peaceable person. *Id.* at 99-100 and *Doc. 23-4* at 1.  The fourth

character witness was Colonel Joseph Gregory DePaul, a deputy chief of staff for

operations with the Pennsylvania National Guard, who also testified that Saterstad has an excellent reputation for being a nonviolent and peaceable person. *Doc. 23-4* at 2-3.  The fifth character witness was Donald Lee Kosier, a retired postal worker and retired National Guardsman, who testified that Saterstad's reputation for being nonviolent and peaceable was great. *Id.* at 3-5.  The sixth character witness was William White, a claims adjustor and a former member of the Pennsylvania Army National Guard, who testified that Saterstad's reputation for being nonviolent and peaceable was among the highest. *Id.* at 5-7.  The seventh character witness was George Pinchorski, retired from a cable company, who testified that Saterstad has a reputation for being a peaceable person. *Id.* at 7-9.

In addition to character witnesses, the defense presented fact witnesses, who testified about Saterstad's whereabouts during certain times on February 1, 2001. First, Stanley Theodore Singer, the former president of the Pennsylvania Cable Television Association, testified that, on February 1, 2001, he and Saterstad attended a meeting of the Cable Television Association in Reading, Pennsylvania. *Doc. 23-4* at 9-10.  Singer testified that Saterstad left his car at Singer's home in Camp Hill, that they travelled to the meeting and arrived in Reading at approximately 9:45 a.m., that Saterstad spoke at the meeting, and that they returned to Camp Hill shortly after 4:00 p.m. *Id.* at 10-11.  Singer did not see Saterstad on February 1, 2001 after that. *Id.* at 11.  Second, Charles A. Morrow,

who at the time was the interim executive director of the Pennsylvania Cable Television Association, testified that Saterstad came to the offices of the Pennsylvania Cable Television Association, located on State Street in Harrisburg, on February 1, 2001 at approximately 4:15 p.m. *Doc. 23-4* at 12-14 & 16. According to Morrow, Saterstad, who was dressed in business attire, left the office at about 5:10 p.m., and Morrow did not see him again that day. *Id.* at 15.

Saterstad also testified in his own defense.  At the time of trial, Saterstad was 48 years old, married, and the father of five children. *Doc. 23-4* at 17-18.  He testified that he was an active church member, a member of and the past president of the Chamber of Commerce, an active member of the YMCA, and active with his community's high school—volunteering as an assistant track coach, serving as media liaison for publicity, conducting teacher workshops, and helping kids with a number of environmental projects. *Id.* at 41 & 43.

Prior to September of 2000, Saterstad was the general manager of Century Communications, a cable television company that served 18 communities. *Id.* at 18 & 32-33.  Saterstad testified that after he retired from the cable company, he was self-employed in two areas—real estate development and vending services. *Id.* at 18-19.  According to Saterstad, he and his wife had renovated homes, and they were interested in doing so in the area in Harrisburg between the Capitol and the Governor's Mansion, which he referred to as the Capitol Heights area. *Id.* at 19.

As to the vending services, he was looking for places in the same general area to install pay phones, and in pursuit of that venture, he conducted a site survey of the area. *Id.* at 19-20.

Saterstad testified that after he retired, he remained active in the Pennsylvania Cable Television Association, and once or twice a week, he went to their offices, which were near Second and State Streets and eight or nine blocks from Maclay Street. *Id.* at 20-21 & 43.  He testified about his regular route to and from Harrisburg: coming from Lykens, he generally went down 322 to Cameron and Maclay Streets and then, if he was heading downtown, he would take Front Street; and he would use the same route home coming up Front Street. *Id.* at 21. Generally, he would stop at the Sunoco station at the intersection of Second and Maclay Streets. *Id.* at 21-22.  At trial, he identified copies of some Visa bills and some receipts showing purchases at that Sunoco station during the period of October of 2000 through February 1, 2001. *Id.* at 22-23.

Saterstad testified that he dealt a little bit with a real estate company in connection with his real estate pursuits. *Id.* at 23.  He also testified that the City of Harrisburg was actively promoting redevelopment in the Capitol Heights area, and after communicating with the City, he received a letter in December of 2000 noting about 40 different addresses that the City was trying to move. *Id.* at 24 & 26. Saterstad did not end up purchasing any property in the Capitol Heights area to

17

renovate, but he did purchase a property in Hershey and one in the Allison Hill area of Harrisburg. *Id.* at 25.  Still, according to Saterstad, he spent a considerable amount of time—two to five visits a week—looking for properties in the Capitol Heights area. *Id.* at 25.  More specifically, he testified that generally each time he went into Harrisburg, he would look around and look for opportunities. *Id.* at 25.  At the same time, he was looking for places to place pay phones. *Id.* at 26.  At trial, he identified a map of the area that borders Reily, Maclay, North 6th, and Third Streets. *Id.* at 127.  On that map, he had marked the location of existing pay phones, locations for proposed pay phones, and properties he was interested in. *Id.* at 26-27.  This was part of the site survey he was conducting. *Id.* at 28.  Further, Saterstad testified that as part of that site survey, he would sit in his car for maybe two hours and watch a site, watch people coming and going, and look at the level of foot traffic in an effort to determine locations for additional pay phones. *Id.* at 28-29.  He would also photograph the locations. *Id.* at 29.

Saterstad testified that he owns a gray Metro and that his wife owns a red van. *Id.* at 34.  Although he primarily drove the Metro, he admitted that occasionally he would use the red van. *Id.* at 34.  According to Saterstad, on February 1, 2001, he left the office of the Pennsylvania Cable Television Association at 5:15 p.m. and headed home using his usual route—Second Street to Maclay Street to Cameron Street to 322. *Id.* at 37.  He also stopped at Chan's

18

restaurant, which is located in a plaza on the corner of Maclay and 6th Streets *Id.* at

37-38.  He testified that he was interested in about four locations to place phones in

that particular area and that, in accordance with his usual practice to check on

properties, he may have circled the block, but he could not recall whether he did

so. *Id.* at 38-39.  He also testified that he could not recall anything unusual

happening on February 1, 2001 or the following day. *Id.* at 39.  He denied ever

stopping and attempting to lure a child into his car or ever stopping and offering a

child $200 to accompany him across the river to fool around. *Id.* at 40.

Saterstad was first contacted about the charges against him on February 21,

2001, and he testified that had no recollection of ever seeing S.C., A.M., or Sharon

Edwards before the criminal proceedings. *Id.*  At trial, Saterstad identified a

number of photographs including photos of his Geo Metro, of his wife's minivan,

and of a leather jacket that he was wearing on February 21, 2001, when he spoke to

an investigator. *Id.* at 44.

The defense also recalled Rodney Shoeman and asked him about his

interview of S.C. on February 11, 2001. *Doc. 23-4* at 45.  More specifically,

Shoeman was asked if during that interview, he had asked S.C. whether anyone

was with her when she saw the red van, and Shoeman responded that he had and

that S.C.'s answer was "no." *Id.*  On cross-examination, Shoeman testified that

during the February 11, 2001 interview, S.C. indicated that the individual she saw

in the red van was the same individual she saw in the Gray Metro who had offered her $200 to go across the river and fool around. *Id.* at 46.

Finally, the defense called Stanley R. Gochenour, a private investigator, and questioned him about his interview of A.M. in November of 2001. *Doc. 23-4* at 48-49. Gochenour testified that with A.M. and her mother's consent, he interviewed A.M. using conventional interview techniques. *Id.* at 50. He explained his practice with regard to such interview techniques. *Id.* First, he lets the person explain to him in his or her own words what they know about the subject matter. *Id.* He only interrupts the person when necessary to clarify the use of pronouns, for example to ask who the person means by "he" or "she." *Id.* Second, he has the person go back and tell the story again, but at this point, he questions the person focusing on areas that he wants "to define exactly an understanding of how things happened in this incident that they are aware of." *Id.* Third, he actually writes out each sentence of what the person says and makes sure that the person is comfortable with his rendition of what the person said. *Id.* at 50-51. Fourth, he types up his notes into a report. *Id.* at 51.

Gochenour testified that he used that process in interviewing A.M. and that at the third step of that process, he made sure that both A.M. and A.M's mother were satisfied with what he understood A.M. was saying. *Id.* Gochenour testified that A.M. told him that she, in fact, had seen someone diving around the

20

neighborhood at 6th and Maclay Streets sometime in February of 2001 and that she was with S.C. at the time. *Id.* He further testified that A.M. said that S.C. pointed out the vehicle and the man in it and said that he had tried to speak with her on a prior occasion and had offered her money to go across the river. *Id.* at 52. According to Gochenour, A.M. said that S.C. told her that that conversation with the man took place in December. *Id.* He also testified that A.M. gave him that information during each of the interview segments including the third segment where she agreed to what he wrote down. *Id.* at 53. Gochenour further testified that A.M. told him that she saw the man driving a red van one morning when she was going to the bus stop and that she was with a Brenda Strawbridge at the time. *Id.* at 53-54.

On cross-examination, Gochenour admitted that his report of his interview of A.M. provides that A.M. stated that S.C. did not make it clear that the offer of money to go across the river happened in December. *Id.* at 54-55. Further, he testified that A.M. reported that it was her impression that the man in the gray car was paying attention to the movements of S.C. *Id.* On redirect, Gochenour read a sentence from his report that stated that S.C. told A.M. that the man talked to her in December, and he testified that A.M. did not tell him that S.C. indicated that she had ever had another conversation with the man. *Id.* at 56.

### 3.  The Prosecution's Rebuttal.

The prosecution called five rebuttal witnesses.  The first was Mark Amway, the owner of an athletic footwear apparel store geared toward the running community, who knew Saterstad for approximately three years. *Doc. 23-4* at 57-58.  According to Amway, Saterstad's reputation in the community for truthfulness is not very good. *Id.* at 59.  On cross-examination, Amway testified that Henry Klugh, a friend and employee of his, wrote a letter to the Hershey High School accusing the Saterstads of moving from Upper Dauphin to Hershey for athletic purposes, which would make Saterstad's daughter ineligible to participate in interscholastic sports at Hershey. *Id.* at 61-62.  Amway sells athletic equipment to Hershey High School. *Id.* at 63.  Amway denied that he was aware that Saterstad threatened to sue him, but he testified that he received emails from Saterstad and eventually Amway blocked those emails. *Id.* at 65-66.

The prosecution's second rebuttal witness was Henry Klugh, the manager of Inside Track in Harrisburg, who testified the he has known Saterstad for about four years, having first met him when he came into the store looking for some help with some issues for his daughter. *Doc. 23-4* at 71-72.  Klugh testified that Saterstaed's reputation for peacefulness and law-abidingness is that he is generally not perceived to be very lawful or peaceful. *Id.* at 73-74.  He also testified that Saterstad's reputation for truthfulness is not very good. *Id.* at 74.  On cross-

examination, Klugh testified that he was aware of considerable conflicts between the Saterstad family and various members of the athletic department of the Derry Township School District. *Id.* at 76.  He admitted that some of the people that he knows that also know Saterstad are from that athletic department and are people that he sells athletic equipment to. *Id.* at 76-77.

The prosecution's third rebuttal witness was Robert Shaffer, a retired athletic director with the Derry Township School District, who testified that he met Saterstad in February of 2001, and that Saterstad's reputation for truthfulness is that he is not truthful. *Doc. 23-4* at 78-80.  On cross-examination, Shaffer testified that he was aware there were some issues between the Saterstad family and members of the Derry Township School District athletic department, that he was aware of an article on the front page of the sports section of the Philadelphia Inquirer called "Running into an Ugly Mess" describing events that were occurring in the Derry Township School District with respect to Saterstad's daughter's continued participation in cross country and track and field, and that he was aware of letters that Saterstad sent to members of the school district complaining about the treatment of his daughter. *Id.* at 81.  Shaffer further testified that in April of 2002, he challenged Saterstad's daughter's PIAA eligibility to continue to participate in interscholastic athletics because of a question about her residence. *Id.* at 82.  He later testified that the initial question as to her eligibility had nothing to

do with her residency; rather, it had to do with the reason she transferred school districts, and that under PIAA regulations, a student is not allowed to transfer from one school district to another for sports reasons. *Id.* at 84.  He also testified that after that issue came up, the issue of residency also came up because Saterstad's daughter told him that she was going home on weekends to her other home. *Id.* at 86.  According to Shaffer, many legal questions needed to be answered before the district could allow Saterstad's daughter to participate. *Id.*  He testified that to get a decision on the matter, the School District filed a petition with District III of the PIAA. *Id.* at 88.  He also testified that Saterstad's daughter was not allowed to wear her Hershey High School track uniform at a national tournament. *Id.* at 88-89. The PIAA eventually determined that Saterstad's daugher was eligible to continue participating in the athletic program of the Derry Township School District. *Id.* at 89.  Shaffer denied that he had ill will toward Saterstad or his daughter. *Id.* at 90-91.

The prosecution's fourth rebuttal witness was Kevin Stover, a teacher and coach with the Derry Township School District, who testified that Saterstad's reputation for peacefulness and law-abidingness is not good and that his reputation for truthfulness is that he is dishonest, manipulative, and deceitful. *Doc. 23-4* at 92-95.  On cross-examination, Stover admitted that he harbors ill will toward Saterstad. *Id.* at 95.  He also testified that he heard that Saterstad had filed a

complaint against him accusing him of accosting Saterstad's daughter. *Id.* at 95-97.

When asked on redirect examination why he has ill will toward Saterstad, Stover

testified that Saterstad has scared his family, that his family has been watched and

photographed, that they do not feel safe around Saterstad, and that they cannot

sleep at night. *Id.* at 98-99.  On recross, Stover testified that he is scared of

Saterstad, that he has reported that to the police, and that he had an attorney write a

letter telling Saterstad to leave his family alone. *Id.* at 99-100.

The prosecution's fifth and final rebuttal witness was Kellie Stover, who is

Kevin Stover's wife and a teacher and assistant coach with the Derry Township

School District. *Doc. 23-4* at 101.  She testified that she knows Saterstad's

reputation for peacefulness and law-abidingness and that he is neither of those. *Id.*

at 102.  She also testified that she knows his reputation for truthfulness and that he

is dishonest. *Id.*

### 4.  The Defense's Surrebuttal.

On surrebuttal, five witnesses testified for the defense.  First, the defense

recalled Pastor Shutters, who when asked about Saterstad's reputation for honesty,

testified that Saterstad "struggles with issues and he tries to be as honest as he can.

That's how people know him both in the Lykens community and in the Grantville

congregation where the people know him." *Doc. 23-4* at 103-105.

25

Second, the defense called Meleah Yancey, a commander in the 4th Battalion, 166 Regiment Combat Arms, who testified that she knows Saterstad's reputation in the community for truthfulness and that his reputation is "average, normal" and he is regarded as a truthful person. *Doc. 23-4* at 105-107.

Third, the defense called William John Cologie, who is currently self-employed but who was formerly the president of the Pennsylvania Cable and Telecommunications Association. *Doc. 23-4* at 107-108. He testified that within the cable industry community, Saterstad he has a reputation as an honest person. *Id.* at 108-109.

Fourth, the defense called Stanley Weaver, Jr., the athletic director and building and grounds supervisor for the Upper Dauphin School District, who when asked about Saterstad's reputation within the community for being truthful testified that Saterstad "is a very interesting individual that works with his kids in athletics but he is truthful whenever I had to deal with him." *Doc. 23-4* at 109-111. Weaver also testified that the Derry Township School District contacted him and asked whether the Saterstad family moved from the Upper Dauphin School District to the Derry Township School District for athletic purposes. *Id.* at 111. It was his understanding that Saterstad's job was no longer in Lykens, and Saterstad moved to the Harrisburg area to be closer to his job site. *Id.*

Fifth, the defense called Lee Wells, an electronics technician who owns his own business servicing televisions and electronic equipment, who when questioned about Saterstad's reputation for being a truthful person testified that he has never heard anything bad about him and "[i]t has all been good." *Doc. 23-4* at 113-115.

## B.  The Verdict, Sentence, Post-Sentence Motion, and Direct Appeal.

On September 11, 2003, the jury convicted Saterstad of attempted luring of a child into a motor vehicle, attempted kidnapping, and stalking. *See Doc. 37-1* at 20.  Judge Lewis later sentenced Saterstad to a total term of imprisonment of two to ten years. *See Doc.* 23-5 at 7.

Following trial, Saterstad was represented by Courtney Kishel, Esquire, who filed a post-sentence motion arguing that the evidence was insufficient to convict Saterstad, that the trial court abused its discretion during sentencing, and that Saterstad's trial counsel, Joshua Lock, Esquire, was constitutionally ineffective by (1) not impeaching S.C. with prior inconsistent statements; (2) not moving to sequester witnesses; and (3) not calling Saterstad's wife, Mary, as a witness. *See Doc. 23-6 & Doc. 23-8*.  After an evidentiary hearing during which Lock as well as Saterstad and his wife testified, Judge Lewis denied Saterstad's post-sentence motion. *See Doc. 23-7* and *Doc. 23-5*.  Saterstad filed a notice of appeal, and Judge

27

Lewis issued an opinion pursuant to Pa.R.A.P. 1925[3] explaining his decision on the

post-sentence motion. *Doc. 23-9.*

Thereafter, in November of 2005, the Superior Court of Pennsylvania

affirmed Saterstad's judgment of sentence, finding that the trial court thoroughly

examined and properly disposed of Saterstad's post-sentence claims. *Doc. 23-12.*

On April 11, 2006, the Supreme Court of Pennsylvania denied Saterstad's petition

for allowance of appeal, *Doc.* 37-1 at 36, and Saterstad did not seek further review

in the United States Supreme Court, *Doc. 1* at 3.

### C.  State Collateral Proceedings.

On June 29, 2006, before the time expired to file a petition for certiorari in

the United States Supreme Court with respect to his direct appeal, Saterstad filed a

"Motion to Correct Factual Errors in the Sexual Offenders Assessment Board

Assessment" ("PCRA I")[4] *See Doc. 23-5* at 15.  After Judge Lewis denied PCRA

I, "without the appointment of counsel, on the ground that the court no longer had

---

[3]  According to the Superior Court of Pennsylvania, a Rule 1925 opinion provides
a trial court with an opportunity to explain its trial and post-trial actions. *See
Commonwealth v. Clinton*, 683 A.2d 1236, 1239 (Pa. Super. Ct. 1996); *see also,
Hull v. Kyler*, 190 F.3d 88, 100-01, (3d Cir. 1999)(discussing Rule 1925).

[4]  Despite the document's title and the subject-matter of the motion, the Superior
Court of Pennsylvania eventually construed it as a PCRA petition. *See Doc. 23-13*
at 5.  For ease of reference, we assign numerical values to the various collateral
review filings made by Saterstad, i.e., PCRA I.

jurisdiction to correct the report," Saterstad filed an appeal to the Superior Court of Pennsylvania. *Commonwealth v. Saterstad,* No. 449 MDA 2007 & No. 2092 MDA 2007, slip op. at 4 (Pa.Super.Ct. Sept. 9, 2008).

On May 21, 2007, while the appeal of PCRA I was pending, Saterstad filed a *pro se* "Petition for Post-Conviction Collateral Relief and Request for Discovery" ("PCRA II"). *Id.* at 6; *Doc. 37-1* at 37-83; and *Doc. 37-2* at 1-23. In PCRA II, Saterstad raised numerous claims of ineffective assistance of counsel. *Doc. 37-1* at 37-83. Although Judge Lewis appointed Jeffrey Engle, Esquire to represent Saterstad, Engle eventually moved to withdraw asserting that PCRA II was untimely and that the grounds therein lacked merit. *See Commonwealth v. Saterstad,* No. 449 MDA 2007 & No. 2092 MDA 2007, slip op. at 6 (Pa.Super.Ct. Sept. 9, 2008). While Judge Lewis disagreed with Engle's contention that PCRA II was untimely, he allowed Engle to withdraw and, without appointing new counsel for Saterstad, he addressed the merits of Saterstad's claims and denied relief. *Id.*at 7 and *Doc. 23-5* at 20. Subsequently, Saterstad filed a notice of appeal, and Judge Lewis issued an opinion on March 3, 2008 pursuant to Pa.R.A.P. 1925 explaining why Saterstad's claims in PCRA II were denied. *See Doc.* 52-1.[5]

Since Saterstad's appeal on PCRA I had not yet been decided and because the appeal on PCRA II involved the same underlying criminal action, the Superior

---

[5]  This particular opinion, however, was not time-stamped, docketed, or distributed to the parties until March 25, 2011. *See Doc. 52* at 45, n. 5 & *Doc.* 23-5 at 25.

Court of Pennsylvania consolidated those appeals. *See Commonwealth v. Saterstad,* No. 449 MDA 2007 & No. 2092 MDA 2007, slip op. at 1-2 (Pa.Super.Ct. Sept. 9, 2008).  With respect to PCRA I, the Superior Court construed the June 29, 2006 motion as a PCRA petition and because counsel was not appointed for Saterstad, the Superior Court reversed the order denying that petition. *Id.* at 5, 10.  Regarding PCRA II, the Superior Court determined that Attorney Engle incorrectly concluded that the petition was untimely, that Engle had not independently reviewed the record to determine whether there were any meritorious issues, and that Judge Lewis, in turn, improperly permitted Engle to withdraw without appointing other counsel. *Id.* at 6-10.  Accordingly, by a decision filed on September 9, 2008, the Superior Court reversed and remanded the two PCRA petitions to allow Saterstad's new counsel, Norris E. Gelman, Esquire, to file an amended PCRA petition. *Id.* at 1, 8-10.

On April 14, 2010, more than one year after the Superior Court remanded the case, Saterstad filed another PCRA petition ("PCRA III") with the assistance of Attorney Gelman. *Doc.* 37-3 at 1-48.  In PCRA III, Saterstad raised numerous claims of ineffective assistance of trial, appellate, and PCRA counsel as well as a claim that his sentence for attempted kidnapping was illegal. *Id.*

On June 2, 2010, Judge Lewis issued a memorandum opinion notifying Saterstad of his intent to dismiss[6] PCRA III. *Doc. 37-3.* Two days later, Saterstad, through Attorney Gelman, filed a supplemental PCRA petition ("Supplement I") claiming that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that on August 28, 2003, which was shortly before Saterstad's September 2003 trial, S.C. was convicted of Retail Theft. *See Doc.* 37-3 at 61-66.

The record also contains another PCRA petition filed by Saterstad *pro se* claiming that: (1) trial counsel was ineffective for not investigating, discovering, and/or presenting impeachment evidence relating to S.C.'s criminal history, and that appellate counsel was ineffective for not raising the claim on direct appeal;

---

[6]     Pa.R.Crim.P. Rule 907(1) provides:

> [T]he judge shall promptly review the petition, any answer by the attorney for the Commonwealth, and other matters of record relating to the defendant's claim(s). If the judge is satisfied from this review that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings, the judge shall give notice to the parties of the intention to dismiss the petition and shall state in the notice the reasons for the dismissal. The defendant may respond to the proposed dismissal within 20 days of the date of the notice. The judge thereafter shall order the petition dismissed, grant leave to file an amended petition, or direct that the proceedings continue.

and (2) trial counsel was ineffective for not calling surrebuttal witnesses to impeach or rebut allegedly biased character testimony. *Doc. 37-3* at 67-76.[7]

On August 31, 2010, Saterstad, through Attorney Gelman, filed another supplemental PCRA petition, claiming that: (1) in an August 10, 2010 interview, S.C. changed her story, casting doubt on her testimony; and (2) trial counsel was ineffective for not discovering S.C.'s juvenile record to impeach her with at trial. *Doc.* 37-4 at 3-17.

On December 8, 2010, Judge Lewis issued another memorandum opinion, putting Saterstad on notice of his intent to dismiss the PCRA petition. *See Doc. 23-16.* The opinion, although recognizing that Saterstad raised other claims, primarily focused on the *Brady* claim. *Id.* Judge Lewis concluded (1) that the supplemental petition raising that claim was time-barred because the evidence offered as newly discovered did not fall within an exception to the PCRA's statute of limitations; (2) that the claim failed on the merits; and (3) that Saterstad waived the claim given that he could have discovered S.C.'s criminal history as early as February 19, 2008, when she turned 18. *Id.*

_____

[7] When he was still proceeding *pro se* in this habeas case, Staterstad asserted that this was only a draft document that he sent to his counsel and copied to the Court, *see Doc. 37* at 5. Saterstad's habeas counsel, however, does not refer to this document as merely a draft. *See Doc. 52* at 42. Further, although Judge Lewis did not discuss the claims in this document in his memoranda, in his December 29, 2010 Order, Judge Lewis referred to this *pro se* petition and stated that he was dismissing all of Saterstad's claims for post-conviction relief. *See Doc. 37-4.*

On December 29, 2010, Judge Lewis issued an order dismissing each of Saterstad's PCRA claims that had been filed since the case was remanded by the Superior Court, including those filed by Saterstad *pro se*. *See Doc. 37-4* at 20.  In addition, over Saterstad's objection, he granted Attorney Gelman's request to withdraw due to conflicts of interest and strained relations. *Doc. 37-4* at 18-19, 21-23.  After Saterstad had filed a timely, *pro se* notice of appeal, Judge Lewis  issued another Rule 1925 opinion. *See Doc. 23-17.*  In that opinion, dated June 30, 2011, Judge Lewis explained his decision regarding Saterstad's Brady claim and ineffective-assistance-of-counsel claims. *Doc. 23-17* at 2-4.  He did not address S.C.'s August 2010 interview. *See Doc. 23-17.*

On appeal again to the Superior Court of Pennsylvania, Saterstad requested the appointment of new counsel, but the appellate court denied that request. *Doc. 23-19* at 4.  The Superior Court, though, granted Saterstad three extensions of time to file a brief, and the final deadline for him to file a brief was August 11, 2011. *Doc. 37-4* at 42.  After that deadline lapsed without receiving a timely brief from Saterstad, on October 3, 2011, the Superior Court dismissed the appeal based on Saterstad's failure to file a brief. *Doc. 37-4* at 47.  On October 13, 2011, Saterstad filed a petition for reargument/reconsideration in the Superior Court. *Doc. 37-4* at 48-50; *Doc. 23-19* at 4.  On November 1, 2011, the Superior Court denied that petition. *Doc. 23-19* at 4.  Thereafter, on November 29, 2011, Saterstad filed a

petition for allowance of appeal, which the Supreme Court of Pennsylvania denied on February 4, 2013. *Doc. 37-4* at 75 & *Doc. 23-19* at 4.  Later, on March 12, 2013, the Supreme Court of Pennsylvania denied Saterstad's application for reconsideration. *Doc. 23-5* at 26.  There is no evidence demonstrating that Saterstad sought any further review in the United States Supreme Court.

### D.  The Habeas Petition and Proceedings.

On April 4, 2013, less than a month after the Supreme Court of Pennsylvania denied his application for reconsideration, Saterstad filed the federal habeas corpus petition under review here. *Doc. 1*.[8]  In his federal habeas corpus petition, Saterstad raises the following 14 claims:

> Claim 1: Trial counsel rendered ineffective assistance by failing to adequately investigate and present impeachment evidence regarding S.C., i.e., S.C.'s criminal history and information contained within her school records.

> Claim 2: S.C.'s post-trial statements demonstrate that Saterstad is actually innocent.[9]

---

[8]  The prisoner-mailbox rule "provides that a document is deemed filed on the date it is given to prison officials for mailing" *Pabon v. Mahanoy*, 654 F.3d 385, 391 (3d Cir. 2011).  Saterstad's petition is dated March 29, 2013, and he asserts that he gave his petition to prison officials for mailing on that date.  Because it does not make a difference in this case, we do not undertake to determine the exact date that Saterstad gave his petition to prison officials for mailing.

[9]  Although set forth as a claim in the habeas petition, Saterstad's habeas counsel makes clear that Saterstad is not attempting to assert a free-standing claim of actual innocence, but rather he is asserting actual innocence in order to overcome any procedural default. *See Doc. 52* at 59, n. 13.

Claim 3: Trial counsel rendered ineffective assistance by failing to cross-examine and impeach S.C. with her prior, inconsistent statements.

Claim 4: Trial counsel rendered ineffective assistance by not requesting that witnesses be sequestered.

Claim 5: Trial counsel rendered ineffective assistance by failing to address the Commonwealth's failure to disclose *Brady* material relating to S.C.'s conviction for retail theft.

Claim 6: Trial counsel rendered ineffective assistance by failing to call Mary Saterstad as a witness.

Claim 7: Trial counsel rendered ineffective assistance by failing to address the prosecutor's improper impeachment of character witness Stanley Weaver.

Claim 8: Trial counsel rendered ineffective assistance by failing to object to the prosecutor's statements during closing argument about the prosecutor's personal opinion regarding the veracity of S.C.

Claim 9: Trial counsel rendered ineffective assistance by failing to call surrebuttal witnesses to impeach or rebut the prosecution's character witnesses.

Claim 10: Trial counsel rendered ineffective assistance by failing to object to the trial court's reasonable-doubt charge.

Claim 11: Trial counsel rendered ineffective assistance by failing to object to the trial court's charge about the believability of witnesses.

Claim 12: Trial counsel rendered ineffective assistance by failing to file a motion for judgment of acquittal regarding the sufficiency of the evidence.

Claim 13: Trial counsel rendered ineffective assistance by failing to address whether the general charge of attempted kidnapping was improper in light of the specific charge of attempted luring.

Claim 14: The evidence was insufficient to sustain a conviction on any of the charges.

*Doc.* 1.[10]  Saterstad seeks to have his conviction overturned. *Id.*

After we conducted a preliminary review of the petition under Rule 4 of the Rules Governing Section 2254 Cases, we gave Saterstad the notice required by *Mason v. Meyers*, 208 F.3d 414 (3d Cir. 2000), regarding the effects of filing a 28 U.S.C. § 2254 petition in light of the Antiterrorism and Effective Death Penalty Act, and he elected to proceed with his petition as a § 2254 petition.  Thereafter, we ordered the respondent to file an answer to the petition.

On July 23, 2013, with leave of court, the respondent filed a partial answer to Saterstad's habeas petition arguing that it is untimely under the one-year statute

---

[10]  In his brief, Saterstad's counsel asserts that Saterstad is also entitled to relief because of the cumulative prejudicial effect of the other errors. *Doc. 52* at 121-123. "The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 542 (3d Cir. 2014).  The cumulative error doctrine is not simply a method of conducting prejudice review. *Id.*  Rather, cumulative error "constitutes a standalone constitutional claim" that "must be presented to the state courts before it may provide a basis for habeas relief." *Id.* at 541 & 543.  Because Saterstad did not present a cumulative error claim in his habeas petition, we will not consider such a claim.

of limitations.  After reviewing the documents presented by respondent and Saterstad's response, rather than immediately ruling on the statute-of-limitations issue, we ordered the respondent to file a full answer.  The respondent complied and filed an answer asserting that Saterstad's petition is not only untimely, but that the grounds for relief either lack merit, have been procedurally defaulted, or both.  Saterstad filed a reply raising numerous issues.  We then exercised our discretion to appoint counsel for Saterstad.  Through newly appointed counsel, Saterstad filed a detailed reply to the respondent's answer.  The respondent then wrote to the Court stating that he will not be filing a further response.

As we began to dive into Saterstad's petition and the record, however, we soon realized that he had completed the maximum term of his prison sentence.  Consequently, we ordered the parties to file supplemental briefs addressing whether the petition had become moot by operation of Saterstad's release from prison and the expiration of his maximum sentence.  The parties filed their supplemental briefs, and the petition is ripe for review.

## III. Jurisdiction.

The writ of habeas corpus is "a fundamental guarantee of liberty," standing as a safeguard against imprisonment of those held in violation of the law, and 28 U.S.C. § 2254 gives federal courts jurisdiction to entertain habeas corpus petitions

from individuals who are "in custody" pursuant to a state court judgment. 28 U.S.C. § 2254(a); *Rose v. Lundy*, 455 U.S. 509, 547 (1982) (Stevens, J., dissenting). Here, Saterstad was "in custody" pursuant to a state court judgment at the time he filed his petition, cloaking this Court with jurisdiction to entertain the petition. Furthermore, Saterstad's release from prison, and the expiration of his maximum sentence, does not divest this Court of said jurisdiction. *See Carafas v. LaVallee*, 391 U.S. 234, 238 (1968) ("[O]nce the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to the completion of proceedings on such application."); *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("The District Court's conclusion that Spencer's release from prison caused his petition to be moot because it no longer satisfied the 'in custody' requirement of the habeas statute was in error. Spencer was incarcerated . . . at the time the petition was filed, which is all the 'in custody' provision of 28 U.S.C. § 2254 requires.").

"The more substantial question, however, is whether [Saterstad's] subsequent release [and expiration of his maximum sentence] caused the petition to be moot because it no longer presented a case or controversy under Article III, § 2, of the Constitution." *Spencer,* 523 U.S. at 7. This question is also a jurisdictional one. *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam). While not initially raised by the parties, we required them to address this question in

38

supplemental briefs "since [it] goes to the very existence of a [case or] controversy for us to adjudicate . . . ." *Sibron v. New York*, 392 U.S. 40, 50 n.8 (1968).

In the habeas arena, "[a]n incarcerated convict's (or parolee's) challenge to the validity of his conviction always satisfies the case-or-controversy requirement." *Spencer,* 523 U.S. at 7. Further, a habeas corpus petition challenging an underlying criminal conviction is not rendered moot by the petitioner's release from custody after its filing so long as there are collateral consequences that flow from the criminal conviction. *Id.* at 12. And "[w]hen a . . . petitioner challenges his underlying conviction, and he is released during the pendency of his habeas petition, federal courts presume that 'a wrongful criminal conviction has continuing collateral consequences' sufficient to satisfy the injury requirement." *Hailstock v. Martinez*, No. 08-2029, 2009 WL 223855, at *1 (M.D. Pa. Jan. 27, 2009) (quoting *Spencer,* 523 U.S. at 8); *see also, United States v. Juvenile Male*, 131 S.Ct. 2680, 2864 (2011) ("When the defendant challenges his underlying conviction, this Court's cases has long presumed the existence of collateral consequences.").

Here, in addition to the presumption of collateral consequences, Saterstad successfully demonstrates that continuing collateral consequences indeed flow from his convictions—a restriction on his Second Amendment right to bear arms and the requirement that he register as a sex offender—and respondent does not

provide any argument in opposition. *See Doc. 57* at 3, 6 and *Doc.* 58.  Accordingly, the petition is not moot.

## IV. Timeliness.

The respondent contends that the petition should be dismissed as barred by the statute of limitations.  A state prisoner seeking habeas corpus relief pursuant to 28 U.S.C. § 2254 must comply with the statute of limitations, which provides, in relevant part:

> (d)(1) A 1–year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]
>
> . . . . .
>
> (d)(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1)-(2).

For a state prisoner who, like Saterstad, did not seek *certiorari* in the United States Supreme Court, the judgment becomes final on the date that the time for seeking *certiorari* expired. *Jenkins v. Superintendent of Laurel Highlands*, 705 F.3d 80, 84 (3d Cir. 2013).  The limitations period is further subject to statutory

tolling during the time "a properly filed application for State post conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." 28 U.S.C. § 2244(d)(2); *Swartz v. Meyers,* 204 F.3d 417, 419 (3d Cir. 2000). A properly filed state petition "is one submitted according to the state's procedural requirements, such as the rules governing the time and place of filing." *Lovasz v. Vaughn*, 134 F.3d 146, 148 (3d Cir. 1998). Conversely, a PCRA petition that is untimely filed is not "properly filed" and does not suspend the running of the limitations period. *See Pace v. DiGuglielmo*, 544 U.S. 408, 417 (2005). Statutory tolling applies to those periods when an application for discretionary review is pending in a state appellate court from the denial of post-conviction relief. *See Kindler v. Horn*, 542 F.3d 70, 77 n.5 (3d Cir. 2008) (noting that the petitioner's PCRA petition was pending at least through the date the Pennsylvania Supreme Court denied his petition for review), *rev'd on other grounds*, *Beard v. Kindler*, 558 U.S. 53 (2009). Statutory tolling also applies to the time period for seeking state court appellate review even if such review is not sought. *Jenkins,* 705 F.3d at 85 n. 4. It does not, however, apply to the time the petitioner has for seeking certiorari review from the United States Supreme Court, *id.* n.5, or the time period during which such an application is pending. *Lawrence v. Florida*, 549 U.S. 327, 329 (2007).

Here, Saterstad's state-court judgment became final on or about July 10, 2006, or 90 days after the Supreme Court of Pennsylvania denied Saterstad's petition for allowance of appeal on direct review. Thus, the limitations period normally would have started to run on July 11, 2006, but here before the statute began to run, Saterstad, on June 29, 2006, filed PCRA I, which triggered the statutory tolling provision in § 2244(d)(2). Respondent does not dispute that Saterstad had a properly filed and pending application for post-conviction review in the Pennsylvania courts until, at least, October 3, 2011, when the Superior Court of Pennsylvania dismissed his post-conviction appeal for not filing a brief. From there, however, the parties' points of view diverge as far as the statute of limitations is concerned.

According to the respondent, Saterstad's act of filing a petition for reconsideration in the Superior Court, after that court had dismissed his post-conviction appeal for not filing a brief, did not operate to toll the limitations period. *Doc.* 23-1 at 5. As such, the respondent argues that Saterstad had until November 4, 2012, to timely file a federal habeas corpus petition.

In support of this position, respondent relies on cases which cite Pa.R.A.P. 1701, which provides in relevant part:

> **(b) Authority of a trial court or agency after appeal**. After an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may . . .

42

(3) Grant reconsideration of the order which is the subject of the appeal or petition, if:

> (i) an application for reconsideration of the order is filed in the trial court or other government unit within the time provided or prescribed by law; and

> (ii) an order expressly granting reconsideration of such prior order is filed in the trial court or other government unit within the time prescribed by these rules for the filing of a notice of appeal or petition for review of a quasijudicial order with respect to such order, or within any shorter time provided or prescribed by law for the granting of reconsideration.

A timely order granting reconsideration under this paragraph shall render inoperative any such notice of appeal or petition for review of a quasijudicial order theretofore or thereafter filed or docketed with respect to the prior order.  The petitioning party shall and any party may file a praecipe with the prothonotary of any court in which such an inoperative notice or petition is filed or docketed and the prothonotary shall note on the docket that such notice or petition has been stricken under this rule.  Where a timely order of reconsideration is entered under this paragraph, the time for filing a notice of appeal or petition for review begins to run anew after the entry of the decision on reconsideration, whether or not that decision amounts to a reaffirmation of the prior determination of the trial court or other government unit. No additional fees shall be required for the filing of the new notice of appeal or petition for review.

Pa.R.A.P. 1701(b)(3).

While respondent is correct that a motion for reconsideration filed under this rule does not toll the time period during which an appeal must be filed, *see Vietri v. Delaware Valley High School*, 63 A.3d 1281, 1288 (Pa. Super. Ct. 2013) ("[H]ad the trial court treated Appellant's post-trial motion as a motion for reconsideration,

that filing . . . would not have tolled the time for appeal.") (citing *Fingles v. Green*, 409 A.2d 99, 101 (1979)), the application of this rule to Saterstad's motion for reconsideration in the Superior Court, on PCRA review, is improper.  Rule 1701 applies to appeals from orders originating in Pennsylvania's trial courts, not motions for reconsideration (or reargument) of decisions rendered by the Superior Court of Pennsylvania.

Indeed, an entirely separate rule of Pennsylvania appellate procedure applies to motions for reconsideration that are filed in the Superior Court, for review of an order entered in that court.  Specifically, Rule 1113 provides in relevant part:

> **(a) General rule.**--Except as otherwise prescribed by this rule, a petition for allowance of appeal shall be filed with the Prothonotary of the Supreme Court within 30 days after the entry of the order of the Superior Court or the Commonwealth Court sought to be reviewed.
>
> (1) If a timely application for reargument is filed in the Superior Court or Commonwealth Court by any party, the time for filing a petition for allowance of appeal for all parties shall run from the entry of the order denying reargument or from the entry of the decision on reargument, whether or not that decision amounts to a reaffirmation of the prior decision.
>
> (2) Unless the Superior Court or the Commonwealth Court acts on the application for reargument within 60 days after it is filed the court shall no longer consider the application, it shall be deemed to have been denied and the prothonotary of the appellate court shall forthwith enter an order denying the application and shall immediately give written notice in person or by first class mail of entry of the order denying the application to each party who has appeared in the appellate court. A petition for allowance of appeal filed before the disposition of such an

> application for reargument shall have no effect. A new petition
> for allowance of appeal must be filed within the prescribed time
> measured from the entry of the order denying or otherwise
> disposing of such an application for reargument.

Pa.R.A.P. 1113(a)(1),(2).

Not only does an entirely separate rule apply to a motion for reconsideration filed in the Superior Court, but, under Rule 1113's express terms, the filing of such a motion tolls the time period during which a petition for allowance of appeal must be filed in the Supreme Court of Pennsylvania.  Furthermore, we are unaware of any Pennsylvania cases reaching a contrary interpretation.  Thus, because Saterstad's motion for re-argument was timely filed in the Superior Court of Pennsylvania, the habeas corpus statute-of-limitations period did not start to run until, at the earliest, February 4, 2013, when the Supreme Court of Pennsylvania denied Saterstad's petition for allowance of appeal.  In short, Saterstad continued to have a properly filed PCRA petition pending review while his motion for re-argument was pending in the Superior Court of Pennsylvania.  Moreover, at the latest,[11] Saterstad filed his federal habeas corpus petition on April 4, 2013, after a period of only 59 days had lapsed under the habeas corpus statute-of-limitations. As such, Saterstad's petition was timely filed.

---

[11]  *See* n.8.

## V.  Procedural Default—Claims 7-11 and 13.

The respondent contends that Staterstad procedurally defaulted Claims 7-11 and 13 raised in his habeas petition.[12]

"Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez v. Ryan*, 132 S.Ct. 1309, 1316 (2012).  One of these rules is that a state prisoner must exhaust available state remedies before filing a petition for habeas corpus in federal court. 28 U.S.C. § 2254(b) and (c).  The exhaustion requirement serves the interests of comity between the federal and state systems by allowing the state an initial opportunity to determine and correct any violations of a prisoner's federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) ("Comity . . . dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this

---

[12]  The respondent also contends that Saterstad procedurally defaulted Claim 2, but as noted before, Claim 2 is not a separate claim, rather it is an assertion of actual innocence in an attempt to overcome any procedural default. *See* n. 9.  Further, although it appears that if Claims 7-11 and 13 are procedurally defaulted, Claims 1, 5, & 12 would be procedurally defaulted for the same reasons.  But the respondent does not specifically argue that Claims 1, 5, & 12 are procedurally defaulted. Thus, we do not consider procedural default as to those claims.  The respondent also does not argue that Claims 3, 4, 6, & 14, which Saterstad raised on his direct appeal, are procedurally defaulted.

claim and provide any necessary relief.").  "The exhaustion rule also serves the secondary purpose of facilitating the creation of a complete factual record to aid the federal courts in their review." *Walker v. Vaughn*, 53 F.3d 609, 614 (3d Cir. 1995).  A habeas corpus petitioner bears the burden of demonstrating that he has exhausted state remedies. *O'Halloran v Ryan*, 835 F.2d 506, 508 (3d Cir. 1987). The petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan,* 526 U.S. at 845.[13]

In order to exhaust state remedies for federal habeas corpus purposes, a petitioner must show that he fairly presented his federal claim to the state courts. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  The fair-presentation requirement provides the State the opportunity to consider and correct an alleged violation of a prisoner's federal rights. *Duncan v. Henry,* 513 U.S. 364, 365 (1995).  "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Id.* at 365-66.  "It is not enough that

---

[13] In Pennsylvania, pursuant to Order 218 of the Pennsylvania Supreme Court, review of criminal convictions and post-conviction relief matters from the Pennsylvania Supreme Court is discretionary and "unavailable" for purposes of exhausting state court remedies under § 2254. *Lambert v. Blackwell,* 387 F.3d 210, 233 (3d Cir. 2004).  Thus, to exhaust state remedies, a Pennsylvania prisoner need appeal only to the Pennsylvania Superior Court.

all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted).  Rather, for a claim to have been fairly presented to the state courts, both the legal theory and the facts supporting the claim must have been presented to the state courts. *O'Halloran*, 835 F.2d at 508.

If a claim has not been fairly presented to the state courts but state law clearly forecloses review, exhaustion is excused. *Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002); *See also McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999) ("When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'").  The issue then becomes one of procedural default.  A procedural default occurs when a prisoner's claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule. *Martinez,* 132 S.Ct. at 1316.  A procedural default generally bars a federal court from reviewing the merits of a habeas claim that the prisoner procedurally defaulted in state court. *Id.; Munchinski v. Wilson,* 694 F.3d 308, 332 (3d Cir. 2012).  "Grounded in principles of comity and federalism, the procedural default doctrine prevents a federal court sitting in habeas from reviewing a state court decision that rests on a state law ground 'that

48

is sufficient to support the judgment,' when that state law ground 'is independent of the federal question and adequate to support the judgment.'" *Munchinski,* 694 F.3d at 332-33 (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991)).  "In such situations, 'resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory.'" *Id.* at 333.

There are, however, exceptions to the bar on consideration of procedurally defaulted claims. *Martinez,* 132 S.Ct. at 1316.  A federal court may consider the merits of a procedurally defaulted habeas claim in two situations: (1) the petitioner establishes cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) the petitioner demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.  "To show cause and prejudice, 'a petitioner must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements.'" *Cristin v. Brennan*, 281 F.3d 404, 412 (3d Cir. 2002) (quoting *Coleman*, 501 U.S. at 753).  "To show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime by presenting new evidence of innocence." *Keller v. Larkins,* 251 F.3d 408, 415–16 (3d Cir. 2001) (citation omitted).

Saterstad failed to present Claims 7-11 and 13 to the Pennsylvania courts in a procedurally correct manner.  Specifically, he failed to file a brief in support of

his appeal of the denial of his PCRA III and subsequent petitions to the

Pennsylvania Superior Court.  Saterstad contends that the procedural-default

doctrine should not, however, operate to bar those claims or, alternatively, any

procedural default should be excused.

### A. Independent and Adequate State Rule.

For the procedural-default doctrine to bar review of Grounds 7-11 and 13 in

Saterstad's federal habeas petition, the procedural bar at issue must have been

premised upon an "independent" and "adequate" state rule. *See Albrecht v. Horn*,

485 F.3d 103, 115 (3d Cir. 2007) (citing *Harris v. Reed*, 489 U.S. 255, 260-61

(1989)).  Generally, a state rule is "independent" if it does not "depend[ ] on a

federal constitutional ruling" *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).  Here,

while Saterstad points out that the Superior Court of Pennsylvania did not cite to a

particular rule when dismissing his appeal for not filing a brief, he does not contest

that the dismissal was premised upon an independent state rule. *See Doc.* 52 at 63.

Furthermore, although we are not to presume that the state court relied upon an

independent state rule, *see Coleman*, 501 U.S. at 735, we do not doubt that the

Superior Court's decision to dismiss Saterstad's appeal for failing to file a brief

was premised upon such a rule, rather than a federal one.  The greater issue,

however, is whether the rule applied is adequate.

A state rule is "adequate" only if it is "firmly established and regularly followed" by the state courts at the time of the procedural bar. *See Ford v. Georgia*, 498 U.S. 411, 424 (1991).  "To be considered firmly established and regularly followed, '(1) the state procedural rule [must] speak[ ] in unmistakable terms; (2) all state appellate courts [must have] refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance [must be] consistent with other decisions.'" *Lewis v. Horn*, 581 F.3d 92, 106-06 (3d Cir. 2009)(quoting *Doctor v. Walters*, 96 F.3d 675, 683-84 (3d Cir. 1996)).  This rule is intended to ensure that state courts do not insulate disfavored claims from federal review and to ensure that federal habeas review is not barred unless petitioners have fair notice of the steps they must take to avoid default. *Bronshtein v. Horn*, 404 F.3d 700, 707-08 (3d Cir. 2005); *Dugger v. Adams*, 489 U.S. 401, 410 n. 6 (1989); *Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1982) ("state courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims").  Importantly, however, "neither an occasional act of grace by a state court . . . nor a willingness in a few cases to overlook the rule and address the claim on the merits" renders a rule inadequate. *Banks v. Horn*, 126 F.3d 206, 211 (3d Cir. 1997).  A rule can be adequate if state courts faithfully apply it in "the vast majority" of cases. *See Dugger*, 489 U.S. at 410 n.6.

Here, Saterstad contends that the Superior Court did not rely on an adequate rule when dismissing his appeal for failure to file a brief.  According to Saterstad, a review of the rules of Pennsylvania appellate procedure does not reveal any rule requiring dismissal of an appeal for a litigant's failure to file a brief. *See Doc. 52* at 63-64.  In support thereof, Saterstad cites to Pennsylvania Rule of Appellate Procedure 2188, *see Doc. 52* at 63, which provides in relevant part: "If an appellant fails to file his . . . brief . . . within the time prescribed by [the appellate procedure rules], or within the time as extended, an appellee may move for dismissal of the matter." Pa.R.A.P. 2188.  Here, the appellee (the Commonwealth) did not move for dismissal of the appeal.  Instead, the Superior Court dismissed the appeal *sua sponte* after Saterstad failed to file his brief in support.

Nonetheless, the note to Rule 2188 explicitly provides: "Each of the appellate courts has established a procedure for the *non prossing* of cases where there has been a failure to comply with the applicable rules.  Accordingly, counsel are advised to prepare briefs . . . in accordance with all rules applicable thereto . . . and to comply strictly with Rule 2185 (time for serving and filing briefs)." Additionally, in 2003, the Supreme Court of Pennsylvania recognized that the Superior Court had maintained an administrative practice of dismissing appeals if an appellant's brief had not been filed after a substantial delay; an administrative practice dating back to before the amendment of the PCRA in 1995. *See*

*Commonwealth v. Robinson*, 837 A.2d 1157, 1162 (Pa. 2003).  As well, Pa.R.A.P.

2101, not discussed by Saterstad, is explicit that the dismissal of an appeal is a

possible sanction for not complying with the briefing requirements set forth in

Pennsylvania's rules of appellate procedure.  Moreover, no state appellate court

has considered Saterstad's Claims 7-11 & 13 on the merits, and the Superior

Court's administrative practice indicates that the result in this case was consistent

with other decisions of that court.  Accordingly, Saterstad procedurally defaulted

Claims 7-11 & 13.  Thus, absent a showing of cause and prejudice, or a

miscarriage of justice, Saterstad is barred from litigating those claims.

## B. Actual Innocence.

Saterstad seeks to avoid his procedural default by claiming that he is actually

innocent and it would, therefore, amount to a miscarriage of justice not to consider

his claims.  "[A] claim of 'actual innocence' is not itself a constitutional claim, but

instead a gateway through which a habeas petitioner must pass to have his

otherwise barred constitutional claim considered on the merits." *Herrera v.*

*Collins,* 506 U.S. 390, 404 (1993).  In order to demonstrate that he is actually

innocent, a petitioner must present new evidence of his innocence. *Schlup v. Delo*,

513 U.S. 298, 324 (1995).  "To be credible, such a claim requires petitioner to

support his allegations of constitutional error with new reliable evidence—whether

it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

physical evidence—that was not presented at trial." *Id.* A petitioner asserting actual innocence must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence presented in his habeas petition. *Hubbard v. Pinchak*, 378 F.3d 333, 339 (3d Cir. 2004). "[C]laims of actual innocence are rarely successful because the necessary evidence is unavailable in the vast majority of cases." *Id.*

In considering a claim of actual innocence, the court "must consider ''all the evidence,'' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell,* 547 U.S. 518, 538 (2006) (quoting *Schulp,* 513 U.S. at 327-328, quoting in turn Friendly, *Is Innocence Irrelevent? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970)). "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors. *Id.* The petitioner's burden "is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *Id.* An actual innocence claim involves evidence that the trial jury did not have before it, and, therefore, the inquiry requires the court to assess how reasonable jurors would react to the overall, newly

supplemented record. *Id.*  This inquiry may require the court to make assessments regarding the credibility of witnesses. *Id.* at 539.

Here, Saterstad's claim of actual innocence is based on an August 10, 2010 tape-recorded interview of S.C. by James Wagner.[14] *See Doc. 37-4* at 8-17.  It appears that a recording of this interview was transcribed by Saterstad's son. *See Doc. 37-4 at 3.*  During this interview, S.C., among other things, stated that there were two men involved, that she actually got into the car on one occasion, and that the man in car that she got into was not Saterstad. *Doc. 37-4* at 8-17.  For numerous reasons, S.C.'s statement is not the type of new, reliable evidence that could possibly lead to a conclusion that this is an extraordinary case that meets the miscarriage-of-justice standard. *See House,* 547 U.S. at 537 (stating that actual innocence requires substantive review only in extraordinary cases).

First, while recantation evidence is ordinarily viewed with skepticism, *see Landano v. Rafferty,* 856 F.2d 569, 572 (3d Cir. 1988) ("Courts have historically viewed recantation testimony with great suspicion."), here the method of conducting the interview and the how the questions were asked during that interview, make S.C. statements particularly unreliable.  Because the transcript of

---

[14] The only thing in the record regarding James Wagner is a statement in Attorney Gelman's supplemental PCRA petition on behalf of Saterstad that Wagner works for a private investigator and was hired by Saterstad's son, Chistopher. *Doc. 37-4* at 4.

the interview itself makes this clear, we set forth most of the transcript, omitting

only small portions that are not particularly relevant:

> JW: Ok [S.C.], could you please give me a quick statement on what
> happened the night with Ed Saterstad?  The night he stalked you.
> When it...what had happened and all that.  Because I have another
> gentleman saying that he did it.  That's what I need to know, see if
> he's lying or not.

> SC: Umm, he was stalking me.

> JW: Ok.

> SC: And, he asked me if I wanted to go across the river with him.
> And I think he said he would give me five hundred dollars.

> . . .

> JW: . . .[C]ould you look at these photos here and tell me which one is
> the gentleman that tried to pick you up.  Or if you see him at all in
> these photos?  One of these photos is the gentleman that's been
> arrested and charged with your case.  And one of these photos is the
> gentleman that is admitting to the case.  The one that said that he's the
> one that talked to you.  And again, you don't mind the tape recorder,
> Right?

> SC: No.

> ***20 seconds of her friend talking in the background as SC looks at
> the photo line-up***

> JW: So don't make a mistake, ok.  Just take your time, you know.  I
> know it's been ten years.

> SC: ***Inaudible***

> JW:  Now, I want you to look real close.  Like this one here, he's
> wearing glasses but you can't...it's hard to see.

***Tape turned off for a phone call***

JW: I said take your time, I know it's been ten years.

***Tape turned off and on several times***

SC: None of these look like him.

JW:  What's that?

SC: I said, none of these look like him.

JW: Do any of them look close to him?

SC: I don't know, maybe this one.

JW: Number 14? Your saying 14 is the one that looks closest to the gentleman that tried to...uhh...well I guess he tried to kidnap you or, uhh, solicit you.  That's what their saying he did, right?

SC: Yeah.

JW: Does he have glasses, or no?  I'm sorry, that doesn't matter. That's why some of them have, or had glasses on.  It just…

SC:  That's how they look now maybe?

JW:  Yeah, that's how they look now.  Mr. Saterstad has not changed very much.  He's still in prison.  And that's what we don't understand, is how somebody that doesn't even know Mr. Saterstad would come up and say that he's the one that had spoke to you.  And the person that's saying he spoke to you, is [sic] already been convicted of the same crime.  He was a teacher at Bishop McDevitt High School.  He was a band teacher there.  You dropped your cigarette ma'am.

***60 seconds of inaudible chatter and silence.  The tape is turned of[f] several times for phone calls ***

SC:  I can see him in my head, but I can't see him on here.

JW: Ok.

***Tape turned off***

JW:  As far as you're concerned right now, number 14 was the one that you thought.  Without me trying to...uhh…say that I'm telling you that's what it is.  I'm just saying, in your opinion, which one was it?

***Inaudible chatter***

SC: He's older now, but he was not young.

JW: I just want you to understand that both of them are on there.  The individual that said he talked to you, and Mr. Saterstad.  I put both their pictures on there though.  So yeah.  I'm not allowed to tell you which one they are, because that would taint it.  You know, but I have both their pictures there.  Mr. Saterstad and the other guy, who is saying that he's the guy who spoke to you.

. . .

SC: You actually say there's two people?

JW: One of them is Mr. Saterstad in those pictures.  The other one is the one who seems to try to say that he's the one that talked to you.  He was admitting to it.  The point I'd like to bring out is that Mr. Saterstad was offered ARD.  Which means he would have never spent any time in prison even if he was guilty.  And he is still screaming that he's innocent, and he has stated personally every time.  I'll tell you what, even a…A guilty person would have took the ARD.

Friend: ***inaudible

JW:  I know.

SC: That's ok, 'cause, I'm thinking now….

JW: Because she physically seen him.

58

Friend: ***Inaudible

JW: Well, see the courts say that would have been imbedded in her brain.  What he…you know, him…she would have remembered what he said.  That's how she's the best witness.

SC: Yeah, that's what I'm saying, it's different when you seeing faces.

JW: Um-huh.

SC: But to physically see him, I would know.

JW:  What about the voice [SC]?

SC: It was a deep voice.  But now I'm thinking it was two guys.

JW: Uh-huh, Is it a possibility that one of them could have been the one that talked to you, and the other one is the one that, that you seen?

SC: That was driving around following me.

JW: Yeah.

SC: Yes.

JW: Is that a possibility?

SC: Yes, now that I'm thinking about it.

JW: And that's why I'm getting one guy saying that it was him that talked to you.  And the other one said that the grandma pointed out…uhh…his car.

SC: Yeah.

JW: The grandmother said the car was parked in front of the apartment, and then you went out and told her: Hey, he's right outside.

SC: Yeah.

JW: And then she…what was he doing outside?

SC: Circling around.

JW: Oh, he was circling.  He wasn't sitting in front of your place?

SC: No, he was circling around.

JW: Ok.

SC: And he was driving by my bus stop.

JW: The guy that, the person that is admitting to this…

SC: He was in a van.

JW: The van.  He had a van.  Did you see anything in the van?

SC: It was a van, there was a white, I mean, grey metro.  I remember that.

JW: Ok.  The one that admitted, he said he was driving a red van. And then he had to turn it in, and then the next day he got a grey Geo Metro as a rental.  Until his van was done.

JW:  So I just want to know from you. Is it possible that the one that's admitting it was the one that talked to you.  And the other one, was you know…as I understand, it was dark out.  You know.  Is there any possibility that it could be, one that talked to you and the other one just happened to be in that spot?  Or either, you thought it was him?

SC: He looks like the detective.

JW: Huh?

SC: He looks like the detective.

JW: He looks like the detective.  **Laughs**

60

SC: He does, he looks like Detective Shoeman.

JW: I understand that you went to the detective yourself.  That you said you had seen him again.

SC: Yeah, Detective Shoeman.

JW: What does it say about the guy that's admitting to it, that was always circling the bus stops over by his house, but has had no kids that were in school?  They couldn't understand why he was circling the bus stops.  Now, his house is right across the river.

SC: Yeah.

JW: Now ok, Mr. Saterstad lives way up in Lykens.  He didn't even know about anything about the West Shore.  And I'll tell you what.  For a white man to try to take a good looking black girl on the West Shore, there would have been…somebody would have noticed it.  You know, he would have had to have a place to take you.  If he meant to take you anywhere.

***Tape stopped***

JW: This guy knows this trial's coming up.  If this information comes up, it is going to screw him real bad.  Unless he tells the truth.  He's telling the truth, or we think he's telling the truth.

Friend: Why don't you give him a lie detector test?

JW: Well that's…we're…we're trying to get anybody who's willing to take it.  Mr. Saterstad is.  You know, the other guy is saying that, well he'll take it only after…you know…she looks at her lineup and all that stuff.  But he's already in trouble.

Friend:  Well that's guilty.

JW: Yeah.

Friend: They got to, they got to….

JW: We can't force anybody to.  The one thing is, is that if we ask them…ahh…to take one, and they refuse, that looks bad.  But if….

Friend: It does

JW: But if somebody says: "hey, I'm going to take a lie detector", to me that looks like…because who's going to try to, try to fake one of them.  It's not easy to fake a lie detector, you know.  One's willing to take one, and offered to take on, but never will.  And the other on[e] is plain out admitting everything that happened, so that's what's confusing.  'Cause the one guy said that he even wrote down the grandmother's apartment number.  You know, I'll show you the map. I want to show you something. This is a map of the area. And he color coded….

SC: He can remember that after….

JW: He remembered it.  Ok, he remembered you, is what he remembers.  Ok, He don't remember, he knew exactly what apartment you went into and everything.  That means he was watching you.  Ok. That's the point I…I mean, this guy even  knew what apartment you went into.  Oops, let me pull this back out.  That's what I'm saying.

SC: I'm looking at this one.

JW: Ok, number 12.

SC: He kind of looks like the tall guy.

JW: Number 12

SC: With the leather jacket on.  He might be.

JW: Ok

SC: I think, but now I don't know who to think.

JW: Ok, but you're saying he looks like this right? With the leather jacket on an all that.  Ok. I'm going to…

***Friend answers phone***

JW: I'm going to turn this off.

***Tape recorder turned off for phone call***

JW: First how

SC: I was in the car, but I didn't admit to it then, that I was in the car.

JW: You were in the car, Ok.  Can you describe the inside of the car?

SC: Two doors…ahh…a regular car. It was a very regular car.

JW: You were in the Geo Metro the first day?

SC: Yeah

　　　. . .

JW: . . . Now, why didn't you tell them you were in the car[] before?  Were you afraid?

SC: Yeah, I was young and I was afraid.

JW: Why did you get in the car?

SC: I was young, kids don't know.

JW: But then you just got right out of there right?

SC: Yeah.

JW: Yeah. So alright, well that's cool, because that way we know exactly what's going on here.  About this…and the guy…now, the guy can't be tried because its been too long.  But I'm going to show in his next court date…look the guy's telling the truth, he did talk to her. He's admitting it, so he's given some kind of credit for that.  And then I have to find out about what happened with Ed.  Because some how it

seems like one guy, the one you got in the car with, and the one just got picked out. The…ahh…I'm trying to see how, you know?

SC: It…It had to be two guys. Could not be just Edward.

JW: Ohh.

SC: The one I picked out was the on[e] that was in the grey Metro

JW: The one that you picked out was the one that was in the Metro

SC: Edward (??................grandma's house??). That was the one I picked out. Me and my grandma picked out several times. ***[SC] continues talking, but is inaudible because her friend starts talking at the same time***

JW: So, was he also the guy when you got in the car?

SC: ***Inaudible***

JW: Ok, which on[e] was the one you got in the car? The one that your grandmother pointed out and stuff, and the other guy was the one you seen standing outside the restaurant? The one that you pointed out her[e]. And that was number 12.

SC: Yeah.

JW: That makes sense now. It's making a lot of sense. You know, because he lives right across the river. You know…the one you picked out. He lives right across the river.

SC: That's what I'm saying.

***recorder shut off for phone call***

JW: Do you feel that there was two people working together. One…

SC: Yes.

JW: Ok, so one you got in the car with the you picked out…that was at the restaurant.  The other one was Ed Saterstad, right?

SC: Yes.

JW:  According to you is…if…if Mr. Saterstad is not the one that tried to pick you up, do you feel that the other man should be in jail? The one that tried…or not?

SC: Yes

JW: So you feel that the guy with the leather jacket, the big guy, that spoke to you in front of the…uhh…is the one that should be in jail?

SC: Yeah.

JW: Yeah, now the other guy didn't do anything wrong to you…or anything like that?

SC: As of just following me, no.  I mean, he needs help.

JW: He needs help, right.  Ok, but other than that, he didn't touch you…he didn't…when you were in the car with him, he didn't touch you…

SC: No.

JW: Nothing like that, right?

SC: No.

JW: So that I…see that's a charge that still can be filed.  Ok, so nothing happened in the car.  Couple minutes you were in the car, you

got out and said…you know…. This ain't right.  I have to get out of here.

*Doc. 37-4* at 8-17.

S.C.'s statements during this interview are simply not reliable enough to conclude that it is more likely than not that, in light of those statements, no reasonable juror would find Saterstad guilty.  Consistent with her trial testimony, S.C. initially reiterated that Saterstad had stalked her and had offered her money to go across the river.  Only after Wagner told her that someone other than Saterstad and confessed to the crime, did S.C. begin to waiver.  Much of the interview consists of Wagner making factual statements, and we have no evidence in this record that he had a good faith basis for the statements of fact that he interjected into the interview.[15]  Further, given Wagner's repeated suggestions that someone else confessed, given Wagner and S.C.'s friend's interjection of their personal opinion that this other person was guilty, and given Wagner's suggestion that Saterstad could not be guilty, S.C.'s responses cannot be considered reliable.  Furthermore, the interview occurred more than nine years after the events in question, which had occurred when S.C. was a child.  Moreover, S.C. did not swear or affirm that the statements that she made during the interview were true and correct.  All of this leads to the conclusion that Saterstad has not met the demanding standard application to showing actual innocence.  Accordingly,

---

[15] Although we do not consider this in making our recommendation, we note that in Saterstad's supplemental PCRA petition, Attorney Gelman states that he was not consulted prior to this interview, but after the interview, he spoke with Wagner and learned that a third party (i.e. the band instructor at Bishop McDevitt) did not admit to this crime and that Saterstad's photo was not in the array that Wagner showed S.C. *Doc. 37-4* at 3-4.

Saterstad's procedural default of Claims 7-11 & 13 is not excused under the miscarriage-of-justice exception to the procedural-default doctrine.

### C. Cause and Prejudice and Claim 9.

In Claim 9, Saterstad contends that Lock, his trial counsel, rendered ineffective assistance by failing to call surrebuttal witnesses to impeach or rebut the prosecution's character witnesses.  More specifically, he contends that he wanted Lock to call Ralph Duquette, a Hershey area coach, and Stephanie Bisor, a Hershey student, who both would testify to the personal bias of the prosecution's rebuttal witnesses based on the "acrimonious high school sports situation involving the defendant's daughter . . . ." *Doc. 37-3* at 72 and *Doc. 52* at 103-104.  And while Lock tried to call Duquett and Bisor as witnesses at trial, during a sidebar, which Saterstad contends Lock failed to preserve on the record, Judge Lewis refused to allow these witnesses to testify. *Id.*   Although Saterstad raised this claim in his *pro se* PCRA petition, PCRA counsel Gelman failed to raise it in any of the petitions that Gelman filed.  Saterstad asserts that when a litigant is represented by counsel, the Pennsylvania courts will not consider a *pro se* filing, and, thus, it was crucial for Gelman to raise Claim 9 in Saterstad's counseled PCRA petition.  And citing *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), Saterstad contends that any procedural default of Claim 9 should be excused because

Attorney Gelman failed to raise this claim in the PCRA petition and supplements that he filed on behalf of Saterstad.

Here, although Judge Lewis did not specifically discuss Claim 9 in any of his opinions, in his order dismissing Saterstad's PCRA claims, he referred to Saterestad's *pro se* petition where this claim was raised.  Thus, it does not appear that Gelman's failure to raise this claim in a counseled PCRA petition resulted in a procedural default. *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013) (holding that when a state court discusses some claims but does not specifically discuss a particular federal claim, there is a rebuttable presumption that the state court nevertheless adjudicated the federal claim on the merits).  Rather, this claim, along with others, was procedurally defaulted when Saterstad failed to file a brief on appeal to the Superior Court.  Moreover, even if this claim was procedurally defaulted by Gelman's failure to raise it in a counseled PCRA petition, Saterstad cannot establish cause and prejudice to excuse that default.

To establish "cause" for a procedural default, a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Werts v. Vaughn*, 228 F.3d 178, 193 (3d Cir. 2000) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Mere "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the

petitioner must 'bear the risk of attorney error.'" *Coleman v. Thompson,* 501 U.S. 722, 753 (1991) (quoting *Murray,* 477 U.S. at 488).  Attorney error that rises to the level of a Sixth Amendment violation, however, does constitute cause. *Id.* at 753-54.  "Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas review entails." *Id.* at 754.

In *Coleman,* the Court held that ineffective assistance of counsel on appeal from a denial of state habeas review is not cause for a procedural default. 501 U.S. at 757.  The Court in *Coleman* reasoned that because there is no constitutional right to counsel in state post-conviction proceedings, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings, and, therefore, attorney error on appeal of such proceedings does not constitute cause to excuse a procedural default. *Id.* at 752-754.  Reiterating "that counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation," the Court stated that "[i]n the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation." *Id.* at 754-55.

In *Martinez,* the United States Supreme Court created a narrow exception to the rule set forth in *Coleman* that an attorney's errors in post-conviction collateral

proceedings do not constitute cause to excuse a procedural default. 132 S.Ct. at 1315. The Court in *Martinez* held that a prisoner may establish cause for the procedural default of an ineffective-assistance-of-trial-counsel claim by demonstrating the ineffective assistance of his or her counsel in "initial-review collateral proceedings," which the Court defined as collateral proceedings that "provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* The Court declined to hold, however, that there is a constitutional right to counsel in initial-review collateral proceedings. *Id.* The Court stressed that the rule of *Coleman* continues to apply "except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial." *Id.* at 1319.

Prior to *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), under Pennsylvania law, when a defendant was represented by new counsel after the verdict, new counsel was required to raise any claims regarding prior counsel's ineffectiveness in post-trial motions and on direct appeal. *See Commonwealth v. Hubbard*, 372 A.2d 687, 695 n.6 (Pa. 1977) (stating that "ineffectiveness of prior counsel must be raised as an issue at the earliest stage in the proceedings at which the counsel whose effectiveness is being challenged no longer represents the defendant. It follows then that when newly appointed post-trial counsel fails to assign the ineffectiveness of trial counsel as a ground for post-trial relief, the issue of trial counsel's ineffectiveness is not properly preserved for appellate review").

70

In *Grant*, however, the Pennsylvania Supreme Court overruled *Hubbard* "to the extent that it require[d] that trial counsel's ineffectiveness be raised at that time when a petitioner obtains new counsel or those claims will be deemed waived" and held that "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." 813 A.2d at 738.

Although Saterstad was tried in September of 2003, after the Pennsylvania Supreme Court's decision in *Grant*, Saterstad's post-trial counsel raised ineffective-assistance-of-trial-counsel claims in Saterstad's post-trial motion, and Judge Lewis, after holding a hearing on those claims, decided those claims. Counsel appealed and the Superior Court of Pennsylvania affirmed specifically stating that because the allegations of trial counsel's ineffectiveness were explored at a hearing before the trial court, which addressed those claims, the claims were properly before the Court. *Commonwealth v. Saterstad,* No. 106 MDA 2005, slip op. at 2 (Pa.Super. Ct. Nov. 10, 2005). Thus, because Saterstad was able to raise ineffective-assistance-of-trial-counsel claims in post-trial motions and on direct appeal, *Martinez* is not applicable.

Even if *Martinez* were applicable, however, Saterstad could not overcome his procedural default because to do so he must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit[,]" *Martinez,* 132

S.Ct. at 1318, but here Saterstad's claim is without merit.  Lock did attempt to call

Duquette and Bisor, but Judge Lewis did not allow him to do so.  And although

Saterstad suggests that Lock was ineffective by failing to preserve on the record

the sidebar where Judge Lewis so ruled, there is no reasonable basis to conclude

that Saterstad was prejudiced by Lock's failure to do so.  During the cross-

examination of the Commonwealth's rebuttal witnesses it came across loud and

clear that there was acrimony between Saterstad and some of the witnesses

regarding Saterstad's daughter's PIAA elibibilty.  Thus, the testimony of Duquette

and Bisor was cumulative and there is not a reasonable probability that had Lock

done anything differently regarding Duquette and Bisor the result of the trial would

have been different.  Accordingly, Saterstad does not have a substantial

ineffectiveness claim against Lock in this regard, and so he cannot use *Martinez* to

excuse his procedural default.

## VI.  The Merits—Claims 3, 4, 6, and 14.

Saterstad raised Claims 3, 4, 6, & 14 on his direct appeal, and Judge Lewis

and the Pennsylvania Superior Court addressed those claims.  As discussed below,

after reviewing those claims under the rubric of 28 U.S.C. § 2254(d), we conclude

that Saterstad is not entitled to habeas relief with regard to those claims.

**A. The Standard for Addressing Habeas Claims on the Merits.**

In addition to overcoming procedural hurdles, a state prisoner must meet exacting substantive standards in order to obtain habeas corpus relief.  As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 limits the power of a federal court to grant a state prisoner's petition for a writ of habeas corpus. *Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011).  A federal court may not grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The standard under Section 2254(d) is highly deferential and difficult to meet. *Cullen,* 131 S.Ct. at 1398.  It "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter,* 562 U.S. 86, 102-103 (2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).  State courts are presumed to know and follow the law, *Woods v. Donald,* 135 S.Ct. 1372, 1376 (2015), and Section

2254(d) "'demands that state-court decisions be given the benefit of the doubt.'"
*Cullen,* 131 S.Ct. at 1398 (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002)).

Under Section 2254(d)(1), only the holdings, not the dicta, of the Supreme
Court constitute "clearly established Federal law." *Howes v. Fields,* 132 S.Ct.
1181, 1187 (2012). "[R]eview under § 2254(d)(1) is limited to the record that was
before the state court that adjudicated the claim on the merits." *Cullen,* 131 S.Ct. at
1398. Under the "contrary to" clause of § 2254(d)(1), a federal habeas court may
grant the writ if the state court arrives at a conclusion opposite to that reached by
the Supreme Court on a question of law or if the state court decides a case
differently than the Supreme Court has on a set of materially indistinguishable
facts. *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal
habeas court may grant the writ if the state court identifies the correct governing
legal principle from the Supreme Court's decisions but unreasonably applies that
principle to the facts of the prisoner's case. *Id.* at 413. But federal habeas relief
may be granted only if the state court's application of clearly established federal
law was objectively unreasonable. *Keller v. Larkins*, 251 F.3d 408, 418 (3d Cir.
2001). "[A]n incorrect application of federal law alone does not warrant relief." *Id.*
"[I]f the state-court decision was reasonable, it cannot be disturbed." *Hardy v.
Cross,* 132 S.Ct. 490, 495 (2011). "A state court's determination that a claim lacks

merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter,* 562 U.S. at 101 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).  "When assessing whether a state court's application of federal law is unreasonable, 'the range of reasonable judgment can depend in part on the nature of the relevant rule' that the state court must apply." *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough,* 541 U.S. at 664).  "Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably,* it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Id.* (emphasis in original).

Under the "unreasonable determination of the facts" provision of § 2254(d)(2), the test "is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record." *Roundtree v. Balicki,* 640 F.3d 530, 537-38 (3d Cir. 2011).  "[T]he evidence against which a federal court measures the reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication." *Id.* at 538.

### B. Sufficiency of the Evidence—Claim 14.

Saterstad claims that the evidence was insufficient for the jury to convict him. Sufficiency-of-the-evidence claims are governed by the seminal case of *Jackson v. Virginia,* in which the Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (emphasis in original). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," and under this standard the court must presume that the trier of fact resolved any conflicts in favor of the prosecution. *Id.* at 319 & 326.

When raised in the context of a habeas case after a decision on the merits by a state court, a sufficiency-of-the-evidence claim is subject to two layers of judicial deference. *Coleman v. Johnson,* 132 S.Ct. 2060, 2062 (2012). First, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 132 S.Ct. 2, 4 (2011). Second, a habeas court may overturn a state court decision rejecting a sufficiency-of-the-evidence claim "only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett,* 559 U.S. 766, 773 (2010)). "Because rational people can sometimes disagree, the inevitable consequence of

76

this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.*

In addressing Saterstad's post-trial motion, Judge Lewis rejected Saterstad's sufficiency-of-the-evidence claim, and on direct appeal, the Superior affirmed based on the reasons set forth by Judge Lewis. *See Commonwealth v. Saterstad,* No. 106 MDA 2005, slip op. at 1-2 (Pa.Super.Ct. Nov. 10, 2005).  Thus, we focus on Judge Lewis's decision.

## 1. Attempted Kidnapping.

Judge Lewis first addressed the sufficiency-of-the-evidence claim with regard to the attempted kidnapping conviction.  After setting forth the standard for reviewing sufficiency claims, Judge Lewis observed that a person is guilty of criminal attempt "when, with intent to commit a specific crime, he does any action which constitutes a substantial step toward the commission of that crime" *Doc. 23-9* at 4 (citing 18 Pa.C.S. §901).  He then set forth the elements of kidnapping:

> (a) A person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:
>> (1) To hold for ransom or reward, or as a shield or hostage.
>> (2) To facilitate commission of any felony or flight thereafter.

> (3) To inflict bodily injury on or to terrorize the victim or
> another.
> (4) To interfere with the performance of public official of
> any governmental or political function.

*Id.* (citing 18 Pa.C.S. §2901). Judge Lewis stated that the evidence at trial established that Staterstad approached S.C., at the time a ten-year-old girl, "and asked her if she wanted $200 to go across the river with him for thirty minutes and 'fool around.'" *Id.* at 5. He reasoned that this showed that Saterstad "had the intent to commit the act of kidnapping," and by asking her to go across the river, Saterstad "took a substantial step towards unlawfully removing S.C. 'a substantial distance under the circumstance from the place where she was found.'" *Id.* According to the judge, "[t]he fact finder could easily conclude that [Saterstad]'s intent was to engage the child in some type of sexual activity, thus supporting an inference that he had the intent to facilitate the commission of a felony, or to inflict or terrorize the child." *Id.* Thus, he concluded that the evidence was sufficient to sustain the conviction for attempted kidnapping. *Id.*

While Saterstad argues that there was no evidence that he took a substantial step toward kidnapping S.C., Judge Lewis reasoned that by asking S.C. to go across the river, Saterstad "took a substantial step towards unlawfully removing S.C. 'a substantial distance under the circumstance from the place where she was found'" Doc. 23-9 at 5. Further, while Saterstad argues that without evidence regarding what he meant by "fool around" there was not sufficient evidence that he

78

intended to engage S.C. in some type of sexual activity and, thus, that he had the

intent to facilitate the commission of a felony, to inflict injury, or to terrorize S.C.

Given the deferential standard that we must apply under § 2254, we cannot say that

Judge Lewis's decision was contrary to, or an unreasonable application of, clearly

established Supreme Court precedent.  Further, it was not based on an

unreasonable determination of the facts in light of the evidence.  Thus, Saterstad's

sufficiency-of-the-evidence claim fails with respect to the attempted kidnapping

conviction.


## 2. Attempted Luring.

We next turn to the attempted luring of a child conviction.  Judge Lewis

noted that "[a] person who lures a child into a motor vehicle without the consent,

express or implied, of the child's parent or guardian, unless the circumstances

reasonably indicate that the child is in need of assistance, commits a misdemeanor

of a the first degree." *Doc. 23-9* at 5 (citing 18 Pa.C.S. § 2910).  He then reasoned

that there was sufficient evidence for the jury to convict Saterstad of attempted

luring since the evidence indicated that: (1) neither S.C. or her grandmother—Ms.

Edwards—knew Sasterstad; (2) Edwards, who was also S.C.'s guardian, did not

give Saterstad consent to take S.C. in his vehicle; and (3) there was no evidence

that S.C. was in need of assistance. *Id.*

Saterstad contends that because Edwards was never specifically asked whether she gave him consent to take S.C. in his vehicle, there was insufficient evidence to convict him. But it is the responsibility of the jury "to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. And, here, it was within the province of the jury to conclude that Edwards had not given Saterstad consent since after S.C. pointed Saterstad out to Edwards, Edwards approached Saterstad to talk to him and after he drove away, she chased him, recorded his license plate number, and then called the police. Thus, Judge Lewis's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, and it was not based on an unreasonable determination of the facts in light of the evidence. And so Saterstad's sufficiency-of-the-evidence claim fails with respect to the attempted luring conviction.

### 3. Stalking.

Finally, we turn to the stalking conviction. Judge Lewis noted that "[a] person commits the crime of stalking when he engages in a course of conduct or repeatedly communicates to another person under circumstances which demonstrate or communicate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such

other person." *Doc. 23-9* at 6 (quoting 18 Pa.C.S. §2709.1(a)(2)).[16]  The judge

pointed out that the evidence showed that Staterstated, repeatedly and over the

course of several days, drove around the parking lot of S.C.'s apartment complex

and the area surrounding her apartment and that the he drove by her bus stop. *Id.*

He reasoned that a ten-year-old child "would obviously be placed in fear and suffer

from substantial emotional distress when [Saterstad], an adult male, repeatedly

followed her around her neighborhood, including driving around her school bus

stop and asking her if she wanted to 'fool around.'" *Id.*  And he concluded that the

evidence was sufficient to convict Saterstad of stalking. *Id.*

Saterstad contends that the prosecution did not present any evidence that he

had a specific intent to place S.C. in fear or bodily injury or to cause her substantial

emotional distress and that, to the contrary, he had a legitimate reason for being in

the area.  While the evidence of intent was thin, it was within the jury's province to

reject Saterstad's testimony regarding the reason for his being in the area

repeatedly and to conclude that Saterstad's actions would place a child in fear and

that he intended the natural consequences of his actions.  Given the "twice-

deferential standard" that applies to habeas claims that the evidence was

insufficient to convict, *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012), Judge

---

[16] While Judge Lewis referred to 18 Pa.C.S. §2901.1(a)(2), as there is no such statute and as 18 Pa.C.S. 2709.1 is the Pennsylvania stalking statute, it is clear that he meant to refer to 18 Pa.C.S. 2709.1(a)(2).

Lewis's decision is entitled to deference under AEDPA.  His decision was not

contrary to, or an unreasonable application of, clearly established Supreme Court

precedent, and it was not based on an unreasonable determination of the facts in

light of the evidence.  Thus, "[a]ffording due respect to the role of the jury and the

state courts," *Coleman,* 132 S.Ct. at 2065, Saterstad's sufficiency-of-the-evidence

claim fails with respect to the stalking conviction.

## C. Ineffective Assistance of Counsel—Claims 3, 4, and 6.

Saterstad raises three ineffective-assistance-of-counsel claims that he

presented in post-trial motions and on direct appeal: (1) trial counsel was

ineffective by failing to impeach S.C. with her multiple, prior inconsistent

statements; (2) trial counsel was ineffective by failing to request that witnesses be

sequestered; and (3) trail counsel was ineffective by failing to call Saterstad's wife,

Mary Saterstad, to impeach S.C.'s testimony.

The Sixth Amendment provides that " [i]n all criminal prosecutions, the

accused shall enjoy the right . . . to have the assistance of counsel for his defence."

U.S. Const. amend VI.  The purpose of the right to the assistance of counsel is to

ensure a fair trial, and "the Court has recognized that 'the right to counsel is the

right to the effective assistance of counsel.'" *Strickland v. Washington,* 466 U.S.

668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). The clearly established federal law as to an ineffective-assistance claim is the standard set forth in *Strickland,* 466 U.S. at 687, which requires a two-part analysis.

Under the first prong of *Strickland*, the petitioner must establish that counsel's performance was deficient. *Id.* at 687. To do so, he must establish that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. As such, the court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance," *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland,* 466 U.S. at 689), and "[t]o overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Cullen v. Pinholster,* 131 S.Ct. 1388, 1403 (2011) (quoting *Strickland,* 466 U.S. at 688). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Richter,* 562 U.S. at 104 (quoting *Strickland,* 466 U.S. at 687).

Under the second prong of *Strickland*, the petitioner must establish prejudice. *Strickland,* 466 U.S. at 687. To do so, the petitioner must show a reasonable probability that, if not for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster,* 131 S.Ct. at 1403 (quoting *Harrington,* 131 S.Ct. at 791).

To prevail on an ineffective-assistance claim, a petitioner must satisfy both prongs of *Strickland*. A court can choose which prong of the standard to apply first, and it may reject an ineffectiveness claim on the ground that the petitioner was not prejudiced without addressing whether counsel's performance was deficient. *Strickland,* 466 U.S. at 697.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. When the state court has decided the claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S.

465, 473 (2007)).  "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

After holding a hearing, Judge Lewis rejected the three ineffective-assistance claims that Saterstad raised in his post-trial motion, and on direct appeal, the Superior affirmed based on the reasons set forth by Judge Lewis. *See Commonwealth v. Saterstad,* No. 106 MDA 2005, slip op. at 1-2 (Pa.Super.Ct. Nov. 10, 2005).  Thus, we focus on Judge Lewis's decision.

Judge Lewis addressed Saterstad's ineffective-assistance-of-counsel claims under the standard for deciding such claims under the PCRA.  Although the Pennsylvania courts use slightly different language to articulate the ineffectiveness standard, the standard used by the Pennsylvania courts is consistent with the *Strickland* standard. *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000) (concluding that the Pennsylvania courts applying the standard from Pennsylvania cases did not apply a rule of law that contradicts *Strickland* and finding that the state court's decision was not contrary to established Supreme Court precedent).  Thus, Judge Lewis's decision on Saterstad's ineffective-assistance-of-counsel claims was not contrary to clearly established federal law.  So we turn to whether his decision resulted in a decision that involved an unreasonable application of clearly established federal law, *i.e., Strickland*.

## 1. Impeachment of S.C. with Prior Inconsistent Statements.

Saterstad claims that his trial counsel, Joshua Lock, was ineffective by failing to impeach S.C. with her multiple, prior inconsistent statements.  In this regard, Saterstad points out that S.C. gave a statement on February 1, 2001, that she gave a statement on February 11, 2001, that she testified at the preliminary hearing on February 28, 2001, and that she testified at trial in September of 2003. He summarizes those statements and notes that "the details of the incident differ, *e.g.*, who was with S.C., where and when the incidents occurred, the period of time during which they occurred, and the actual wording of the solicitation, *e.g.*, whether a hotel was mentioned." *Doc. 54* at 77-81.  Judge Lewis rejected Saterstad's claim that Lock was ineffective by failing to impeach S.C. with prior inconsistent statements.  Although Judge Lewis acknowledged that Saterstad pointed out several inconsistent statements made by S.C. including the number of days over which the incidents occurred and whether Saterstad approached her with his car window already down or whether she witnessed him roll the window down, he found that Lock was not ineffective by failing to impeach S.C. with her prior inconsistent statements. *Doc. 23-9* at 7-8.  First, he noted that Lock had a reasonable strategic basis for his decision:

> At an evidentiay hearing before this court on October 28, 2001, trial counsel explained his reasonable strategic basis for not attempting to impeach S.C. with prior inconsistent statements.  Trial counsel pointed out that the child was simply

mistaken as to the exact days that she saw [Saterstad] in his car.
Trial counsel further testified that in his opinion it would not be
wise to "quibble with a child" about whether she was right or
wrong about exactly when she saw [Saterstad]'s car.  Trial
counsel also testified that strategically, in his opinion, it is
unwise to attack a child witness for every single inconsistency
that the child might have made in various statements, due to an
adverse affect that it may have on the jury.

*Doc. 23-9* at 7-8 (citations omitted).

Second, he concluded that Saterstad was not prejudiced by counsel's failure

to impeach S.C. with all her inconsistent statements:

There is not a reasonable probability that the outcome of
the proceeding would have been different but for the errors or
omissions of counsel.  The exact number of dates over which
these events occurred, and whether or not S.C. actually watched
[Saterstad] roll down his car window are not significant
inconsistencies that would have led to a different outcome.
These events happened repeatedly in the morning, afternoon
and early evening hours over the course of several days.  Ten
year old S.C. was obviously confused as to the exact days and
times that these numerous incidents occurred.  Further, if trial
counsel attacked S.C. on the stand with her prior inconsistent
statements, the jury may have been repulsed by such strategy,
and therefore impeaching S.C. may have had an adverse effect
on [Saterstad].  This court finds that trial counsel was not
ineffective when he failed to impeach the victim, S.C., with
prior inconsistent statements.

*Doc. 23-9* at 8.

While it may have been a sound trial strategy to impeach S.C. with every

inconsistent statement that she made, we cannot say that Lock was ineffective by

failing to do so.  He pointed to a strategic reason for not doing so, he did impeach

her one statement, and her testimony otherwise showed that she was unclear about

87

the precise sequences of events.  Given these circumstances, under the "doubly

deferential" standard that applies to a *Strickland* claim evaluated under 28 U.S.C.

§ 2254(d)(1), *Knowles*, 556 U.S. at 123, Judge Lewis's determination that Lock

was not ineffective by failing to impeach S.C. with all her prior inconsistent

statements was reasonable.  Accordingly, Saterstad is not entitled to habeas relief

on this claim of ineffective assistance of counsel.


### 2. Sequestration of Witnesses.

Saterstad claims that Lock was ineffective by failing to request that

witnessed be sequestered and that as a result A.M. was able to align her testimony

with the testimony of S.C.

Characterizing this claim as one of arguable merit, Judge Lewis noted that

"[t]he purpose of sequestration is to prevent a witness from molding his testimony

with that presented by other witnesses," that by not requesting that the witnesses be

sequestered, trial counsel gave A.M. the opportunity to hear S.C. testify,[17] that

counsel should have requested sequestration, and that there is no reasonable basis

why he did not do so. *Doc. 23-9* at 9.  Although Lock had testified at the

evidentiary hearing that he could not recall the reason why he did not request that

the witnesses be sequestered, he also testified that his reasoning may have been to

---

[17] Although Judge Lewis also stated that A.M. also had the opportunity to hear
Sharon Edwards testify, A.M. actually testified before Edwards.

allow A.M. to sit in the courtroom so that she would testify to the same facts as

S.C. and then counsel could impeach her with prior inconsistent statements that she

had given to defense counsel's investigator. *Id.* Judge Lewis concluded, however,

that Lock did not appear to have a strategic reason for not requesting sequestration

because Lock was unable to recall the exact reason for doing do and he was unsure

whether he intentionally did so. *Id.* Nevertheless, Judge Lewis concluded that

Saterstad was not prejudiced in this regard. *Id.* He reasoned:

> A.M. testified at trial that she was present in the courtroom
> during testimony from S.C. Additionally, A.M. testified as to
> events that she had been told about during conversations with
> her friend, S.C. The jury was able to hear and see that A.M.
> was present during S.C.'s testimony, and that A.M. was
> testifying as to events that she had been told about, therefore
> allowing the jury to properly weigh A.M's credibility. Because
> the jury was aware of, and able to take into consideration the
> fact that witnesses were not sequestered, [Saterstad] was not
> prejudiced. Additionally, because A.M's testimony came
> solely from what she had been told by S.C., there is not a
> reasonable probability that the outcome of the proceeding
> would have been different had the witnesses been sequestered.

*Doc. 23-9* at 10 (citations omitted).[18]

---

[18] Judge Lewis also states that "there is not a reasonable probability that [the]
outcome of proceedings would have been different, especially considering that trial
counsel referenced statements given to a defense investigator, which may have
been available for impeachment." *Doc. 23-9* at 9-10. The import of this statement
is not entirely clear, but we note that at trial Lock did call the defense investigator,
Stanley Gochenour. He questioned Gochenour about his interview of A.M. in
November of 2001, and he used Gochenour's testimony to impeach A.M.'s
testimony that on the day she saw the red van, nobody was with her and that it was
not around Christmas of 2000 that S.C. told her that a man had approached her,

Because A.M. testified about times when she herself saw the gray car, the man, and the red van, we do not agree with Judge Lewis's statement that A.M.'s testimony came solely from what S.C. told her.  Nevertheless, considering that A.M. was cross-examined rather extensively about the basis of her knowledge, she showed considerable confusion, and at one point she admitted that she had given an answer because she had heard S.C. testified to such, the jury was aware that A.M. may have attempted to mold her testimony to that of S.C. and was able to weigh that in their decision, and under the deferential standard of review, we cannot say that Judge's Lewis's conclusion was an unreasonable application of *Strickland*.  Accordingly, Saterstad is not entitled to habeas relief on this claim of ineffective assistance of counsel.

### 3. Mary Saterstad.

Saterstad claims that Lock was ineffective by failing to call Saterstad's wife, Mary, to testify that at the time that S.C. and A.M. said they saw the red van, the red van, which belonged to his wife, was in Maryland.  At the evidentiary hearing on the post-trial motion, Mary Saterstad testified that she drove the red van to Maryland on January 26, 2011, for the birth of her grandchild, and that she remained in Maryland until February 7, 2001. *Doc. 23-7* at 49.  She also had credit

---

offered her $200, and asked if she wanted to go across the river. Compare *Doc. 23-3* at 57-58 (A.M.'s testimony) with *Doc. 23-4 at 52-54* (Gochenour's testimony).

card receipts for purchases made in Maryland during that time period. *Id.* at 52-53.

She further testified at the evidentiary hearing that during a break in the trial, she

brought up the red van with Lock. *Id.* at 52.

Lock also testified at the evidentiary hearing.  He testified that he gave his

file to Attorney Kishel after Kishel began representing Saterstad. *Doc. 23-7* at 8-9.

Lock testified that he did not recall a specific conversation with Saterstad about

calling Mary Saterstad as a witness. *Id.* at 29-30.  He also testified that he did not

recall speaking to Mary about her testifying because he did not believe that she had

anything relevant about which to testify. *Id.* at 30.  The following exchange then

took place at the evidentiary hearing between Kishel and Lock:

> Q: [by Kishel]  I am handing you a piece of paper that
> was found in your file and I have copied for the Court.  Does
> this chart look familiar to you?
>           Well, let me say this.  Would this have been a
> document that you would have drafted yourself in preparation
> for trial?
>
> A: [by Lock] No.
>
> Q: Would it be a document Mr. Saterstad prepared in
> preparation for trial for you?
>
> A: That's what I believe.
>
> Q: This chart identifies inconsistencies but if you look at
> the third line from the bottom, the three rows across.  The next
> day the man was at the bus stop and cites pages one and three
> under the victim's statement.  Next column reads, the car was
> parked at the bus stop at 7:45 and the question was, did you tell
> any of your other friends, the school bus driver, anybody at
> school.  And that answer was no.  That was page 48 and then

the notes in that column indicate can establish that wife and wife's red van was out of the state during this period attending to our first grandchild.  Do you see that?

A: Yes.

Q: Have you seen this paper before?

A: You showed it to me before the hearing and I know I saw it then.  Whether I saw it before that or not, I can't tell you with certainty.  I mean if your telling me you got it from my file, then obviously I did.

Q:  I also am handing you a copy of a credit card statement and there were several in the file but this particular statement is from January through February of 2001, which would have been the time frame in which this incident allegedly occurred.  Would you—have you seen this before?

A: Yes.

Q: This is—can you tell me where you obtained this?

A: From Mr. Saterstad.

Q: This was a credit card statement that I found in your file.  Would you agree with me that the—let me ask this question first.  Do you recall when Mr. Saterstad provided this to you?

A: No, but it was well in advance of the trial.

Q: The entries on this statement if you refer to, I apologize they are misstapled.  They are out of order.  First page that you have towards the bottom.  The payments indicate transactions that would have occurred in Maryland, various transactions from January 26th through the 28th, correct?

A: Yes.  I see transactions that occurred in Maryland.

Q:  Then on the third page because they are out of order, the transactions continue from January 28th through February 3rd in Maryland, correct?

A: That's right.

92

Q: Did you ever have a conversation with Mr. Saterstad about Mary taking the red van to Maryland during this time frame?

A: No.

Q: Did you ever have it during trial that Mary was to be called as a witness to establish that the red van was out of the state during this time frame?

A: No.

Q: Can you offer any explanation as to why these two pages were in the file other than what you have already identified?

A: Yes.  A transaction—my recollection is that a transaction occurred at a Sunoco gas station at Second and Maclay Streets in Harrisburg on the day that the initial contact with [S.C.] allegedly occurred.

Q: I don't recall that ever being testified to.  Do you recall that specifically?

A: Yes or perhaps if you're telling me you don't remember it, perhaps it was to establish—I don't know.  I thought that was—that there was a transaction that day.  I know Mr. Saterstad was seeking to demonstrate that his customary route for returning home from downtown Harrisburg was north on Second Street to Maclay, east on Maclay to Cameron, north on Cameron to the northern part of the county.  And evidence of that was stop—he had a reason to be downtown in Harrisburg on various occasions, including the day on which the attempted luring allegedly occurred.

If he would have followed the route I just described to you, it would have put him in the area in which his car was seen at about the time that it was seen and I guess the stops if you're telling me there wasn't a transaction on the date of the attempted luring, then the credit cards would have been used to established that that was indeed the route that he would typically take because that was a gas station that he had patronized in the past.

. . .

Q: Did you ever question Mr. Saterstad as to why there are other transactions on that credit card bill with respect to Baltimore when, in fact, there are also transaction in Harrisburg or the surrounding Harrisburg area, Lykens I believe?

A: I don't have a recollection of doing it, no.

Q: Can you identify or shed some light as to why if this was in your file Mrs. Saterstad was not called to testify regarding the red van?  Your recollection is you did not have that conversation?

A: I can tell you that I didn't have that conversation, number one.  And number two, if I had had that conversation, I would have been very skeptical about whether or not it was accurate or not because the child's description of the vehicle owned by Mr. Saterstad if not personally observed by her would imply and perhaps do a lot more than imply that the police troubled themselves to go to PennDOT, identify every vehicle owned by the Saterstad family, having identified a red van as among those vehicles, provided that information to the child so that she in turn could provide it to the police, who then could include it in their report.  That probably would have been imprudent.

*Doc. 23-7* at 30-35.

Lock also testified that he had no reason to call Mary Saterstad and that only shortly before the evidentiary hearing on the post-trial motion did he become aware of the suggestion that the van was in Maryland. *Id.* at 40.  According to Lock, the defense was that Saterstad was routinely in S.C.'s neighborhood attempting to purchase homes to rehabilitate and looking for locations to place pay phones and thus "there was nothing remarkable about the presence of either his car or the van in that neighborhood." *Id.*

94

On recross-examination, Lock was confronted with an email sent to his office by Saterstad asking whether Mary was going to be called as a witness. *Id.* at 41-42.  Further, when asked if he could explain why the chart with the notation about Mary taking the van out of state was in his file, he testified:

> A: I had no knowledge about it because I never heard it. If I read this, it was forgotten.  If you're asking me what I believe the reference in the E-mail was.  It was to establish the time that Mr. Saterstad returned home on the night of the attempted—of the alleged lurring to once again place him neighborhood at or about the time in the car described by the children at or about the time the events that they testified to allegedly occurred.

> Q: Well, if, in fact, Mary Saterstad's testimony was that she was in Maryland, she couldn't very well testify to that, could she?

> A: Mary Saterstad never told me she was in Maryland. Mr. Saterstad never told me she was in Maryland.

> Q: Well, I understand that.  That wasn't necessarily my question.  My question was if, in fact, Mary was in Maryland, she would not have been able to testify as to what time the defendant got home the evening of the alleged incident?  Would you agree with that?

> A: I would agree with that as a metaphysical proposition. I was told, however, as a practical matter that she was home when Mr. Saterstad arrived.

> Q: Do you specifically recall those conversations?

> A: Yes.

> Q: When and where?

> A: In my office in a conference room referred to as the oak room probably no less than 20 times.

*Id.* at 42-43.  When asked what his trial strategy was, Lock testified that it was to prove that Saterstad was in the area when this happened but that he had an explanation for being there, to show that S.C.'s testimony was not credible, and to present character evidence, which would suggest that it was improbable that Saterstad committed the alleged crimes. *Id.* at 43-44.[19]

During the evidentiary hearing on his post-trial motion, Saterstad also testified.  He testified that prior to trial he talked to Lock several times about calling Mary to testify about her driving the red van out of state at the time it was allegedly seen in Harrisburg. *Id.* at 55.  He also testified that prior to trial he prepared and sent to Lock the chart previously shown to Lock. *Id.* at 54-56.  He testified that he sent the chart by email through Lock's secretary as well as an email asking if Mary was going to testify. *Id.* at 55-56.  According to Saterstad, he initially provided Lock credit card statements to show that he made purchases at the Sunoco on Second and Maclay Streets, but after his wife brought up the fact that she was out of state, he brought that up to Lock. *Id.* at 56-57.  He also testified that during a break at trial, among other things, he asked Lock if Mary was going to testify. *Id.* at 57.  He testified that he did not recall Lock's answer, that the answer was neither affirmative nor negative, but that they just went on to discuss

---

[19] There is also an affidavit from Lock in the record. *Doc. 37-2* at 9.  It is not clear, however, whether this affidavit was accepted as part of the record at the evidentiary hearing, and Judge Lewis does not refer to it in his opinion.  As such, we do not consider it.

something else. *Id.*  Although Saterstad testified that he provided a lot of input to

Lock, he does not recall discussing the chart that he made with Lock. *Id.* at 58.

Judge Lewis concluded that Lock was not ineffective for failing to call Mary

Saterstad at trial. *Doc. 23-9* at 11.  First, he acknowledged that Mary testified at the

hearing that she was available to testify and was willing to cooperate and that

Saterstad contends that if Mary had been called to testify was trial, she would have

testified and shown receipts to prove that she had the red van in Maryland during

the time that Saterstad was purportedly seen driving it. *Doc. 23-9* at 11.  Second,

Judge Lewis stated that Lock testified that he was not made aware, either prior to

or at trial, that Mary Saterstad had the red van in Maryland, and, according to

Lock, he did not become aware of that until the day of the evidentiary hearing. *Id*.

Then, the judge stated and concluded:

> Trial counsel also testified that the defense strategy at
> trial was never to deny the fact that [Saterstad] was in the area
> of the alleged incident while driving either a gray Metro or a
> red van, but rather to show that he had a legitimate, work-
> related purpose for being in the area.  Additionally, any credit
> card receipts that Mary Saterstad may have produced would
> simply prove that purchases were made in Maryland.  The
> credit card receipts did not indicate what vehicle she was
> driving when such purchases were made.  After review of the
> record, this court is satisfied that trial counsel was not
> ineffective when he failed to call Mary Saterstad as a witness.

*Id.*

Saterstad argues that Judge Lewis's decision was based on an unreasonable determination of the facts in light of the evidence presented because he credited Lock's testimony that Lock did not know prior to or during trial that Mary Saterstad had taken the van to Maryland during the relevant time, but given the chart and credit card statements, Lock should have known.  While Judge Lewis's opinion is not entirely clear, we, however, do not read his opinion as basing his conclusion on a finding that Lock did not know about the assertion that the van was in Maryland.  Judge Lewis set forth the summary of Lock's testimony in that regard in the same paragraph that he set forth that Mary was available at trial to testify and what she would have testified to if called.  Then, in a separate paragraph, Judge Lewis talks about Lock's trial strategy and that the credit card receipts would not prove what vehicle Mary Saterstad was driving when the purchases were made in Maryland.  From this, we think that Judge Lewis was concluding that Lock was not ineffective because his trial strategy was reasonable and because Saterstad was not prejudiced by Lock's failure to call Mary Saterstad as a witness at trial.[20]

---

[20]  Even if Judge Lewis's decision is construed as based on a finding that Lock did not know of the contention that Mary Saterstad had the van out of state and assuming that that finding was unreasonable in light of the evidence presented, for the reasons discussed below, we would not conclude, even under a *de novo* standard of review, that Lock was ineffective by failing to call Mary Saterstad as a witness at trial.

Moreover, a reasonable attorney could decide to forgo calling Mary Saterstad to challenge S.C. and A.M.'s testimony about the red van and to concentrate on the chosen defense, which included showing that although Saterstad was in the area, he was there for a legitimate reason.  This is especially so since it could not reasonably be disputed that Saterstad was in the area since S.C.'s grandmother recorded Saterstad's license plate after S.C. pointed out Saterstad's car and Saterstad as the man that attempted to solicit her.  While S.C. and A.M. testified that they saw Saterstad in the red van a couple of days after the initial solicitation attempt, Mary Saterstad's testimony, if accepted by the jury, would only have shown that the van was in Maryland until February 7, 2001, less than a week after the dates S.C. and A.M. testified they saw the van.  In sum, while hindsight shows that Lock's strategy may not have been the best strategy, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of other reflects trial tactics rather than 'sheer neglect,'" *Harrington v. Richter*, 562 U.S. 86,  109 (2011) (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)), and it is at least arguable that a reasonable attorney could pursue the trial strategy that Lock did.

Further, considering all the testimony, both at trial and at the evidentiary hearing, there is not a reasonable probability that if Mary Saterstad had testified at trial, the result of the trial would have been different.  While her testimony would

have contradicted that of S.C. and A.M. as to when they purportedly saw Saterstad in the red van, it would most likely only have caused the jury to believe that the girls were mistaken as to dates, given that Saterstad was in the area frequently, that he sometimes drove the van, and that Mary Saterstad contends that the van was in Maryland only to February 7, 2001.  In sum, Saterstad was not prejudiced by Lock's failure to call Mary Saterstad as a witness.

Under the "doubly deferential" standard that applies to a *Strickland* claim evaluated under 28 U.S.C. § 2254(d)(1), *Knowles*, 556 U.S. at 123, Judge Lewis's decision was not unreasonable.[21]  Accordingly, Saterstad is not entitled to habeas relief on this claim of ineffective assistance of counsel.

## VII. The Merits—Claims 1, 5, and 12.

For the same reasons, discussed previously, that Saterstad procedurally defaulted Claims 7-11 & 13, it appears that he procedurally defaulted Claims 1, 5, & 12.  But the respondent does not specifically argue that Claims 1, 5, & 12 are procedurally defaulted.  Accordingly, rather than recommending that those claims be denied as procedurally barred, we address the claims on the merits.  And we do so using a *de novo* standard of review since the Pennsylvania Superior Court, which dismissed Saterstad's appeal on collateral review for failure to file a brief,

---

[21] *See* n. 19.

did not adjudicate the claims on the merits. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (reviewing claim *de novo* where the deferential standard that applies under 28 U.S.C. § 2254(d) to claims that were adjudicated on the merits in state court proceedings is inapplicable).

Claims 1, 5, and 12 are ineffective-assistance-of-trial-counsel claims, and to briefly recap, under *Strickland*, Saterstad must establish that counsel's performance was deficient and that there is a reasonable probability that, if not for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687 & 694.  "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Premo v. Moore*, 562 U.S. 115, 122 (2011).

**A. Claims 1 & 5.**

In Claim 1, Saterstad claims that Lock was ineffective by failing to investigate and present evidence to impeach S.C.  More specifically, he contends that Lock should have discovered and impeached S.C. with her 8/28/03 retail theft conviction and with her school records.  In Claim 5, Saterstad claims that Lock was ineffective by failing to address the Commonwealth's failure to disclose in violation of *Brady v. Maryland,* 373 U.S. 83 (1963)*,* material relating to S.C.'s conviction for retail theft.

### 1. S.C.'s Retail Theft Conviction.

Prior to trial Lock requested from the prosecution, among other things, the criminal records and records regarding "criminal activity, arrest, and/or conviction of any and all witnesses whom the Government intend[s] to call during the course of this case." *See Doc. 42* at 75-76.  The prosecution did not, however, turn over S.C.'s arrest record.  While Saterstad claims that Lock was ineffective by failing to investigate and present evidence regarding S.C.'s retail theft conviction and by failing to address the Commonwealth's failure to disclose S.C.'s arrest record, he has not pointed to or suggested that there is any evidence from which it can reasonably be inferred that Lock could have discovered the retail theft conviction given that S.C. was a juvenile at the time and juvenile records are generally sealed. *See Doc. 52* at 87 (acknowledging that "at the time of trial and for some years thereafter, until 2007, such record was not publicly available") and at 89 ("There is not an obligation on the defense to discover a criminal history, particularly where it is unavailable until many years after the trial.").  Accordingly, there is no basis to conclude that Lock rendered ineffective assistance of counsel with respect to S.C.'s retail theft conviction.[22]

---

[22] While Lock presented a claim based on *Brady* to the state court and while Saterstad's counsel in his reply brief frames Claim 5 as a *Brady* claim, Saterstad's habeas petition in this case does not contain a *Brady* claim.  Rather, in his habeas petition, Saterstad frames Claim 5 as an ineffective-assistance-of-trial-counsel claim. *See Doc. 1* at 15.  Thus, that is how we will consider the claim.  We note,

## 2. S.C.'s School Records.

After serving a subpoena on the Harrisburg School District for S.C.'s school records and being told by the School District that due to privacy concerns it would not produce the records voluntarily, Lock filed a motion to compel the disclosure of S.C.'s school records to the trial court for an *in camera* review. *Doc. 42* at 78. In response, Judge Lewis ordered the Harrisburg School District to produce S.C.'s school records for an *in camera* review by the Court to determine whether the records contain any exculpatory evidence that should be disclosed to the defense, and he ordered that the records be delivered to his chambers in a sealed envelope. *Id.* After the Harrisburg School District informed Judge Lewis that S.C.'s school records were with the Ronald Brown Charter School, rather than the Harrisburg School District, Judge Lewis, on October 18, 2001, ordered that the Ronald Brown Charter School provide him with S.C.'s records within 10 days for an *in camera* review. *Id.* at 78-79. There is nothing further in the record about the *in camera* review of S.C.'s school records.

There is no basis in the record to conclude that Lock was ineffective with respect to S.C.'s school records. Saterstad asserts that there is no indication that the *in camera* review ever occurred, and he suggests that Lock should have

---

however, that if framed as a *Brady* claim, Claim 5 is procedurally defaulted for the same reasons as Claims 7-11 and 13 are procedurally defaulted.

followed up. But there is no basis to conclude that Judge Lewis did not conduct the *in camera* review that he ordered. Further, there is no evidence in the record as to whether S.C.'s school records contain any exculpatory material. While Saterstad concedes that the record does not contain any indication of what information is contained in S.C.'s school records. He, nevertheless, requests an evidentiary hearing with regard to S.C.'s records.

When reviewing a claim under §2254(d)(1), the habeas court is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011). But where, as here, the state court has not adjudicated the claim on the merits, that limitation does not apply, and 28 U.S.C. § 2254(e)(2) must be considered. *Han Tak Lee v. Glunt*, 667 F.3d 397, 405 (3d Cir. 2012). Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (A) the claim relies on—
>     (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>     (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"Section 2254(e)(2) begins with a conditional clause, '[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings,' which directs attention to the prisoner's efforts in state court." *Williams v. Taylor*, 529 U.S. 420, 431 (2000).  The first question is "whether the factual basis was indeed developed in state court, a question susceptible, in the normal course, of a simple yes or no answer." *Id.*  If the answer to that first question is no, the next question is whether the prisoner "failed" to develop the factual basis for his claim.  The term "failed" as used in Section 2254(e)(2) connotes some omission, fault or negligence on the part of the prisoner. *Id.* at 431-32.  "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432.  "The purpose of the fault component of "failed" is to ensure the prisoner undertakes his own diligent search for evidence." *Id.* at 435.  Whether the prisoner was diligent in this context depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue his claims in state court. *Id.*  "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.  If the prisoner was diligent in attempting to develop the factual basis of his claims at the relevant stages in the state proceedings, the prisoner has not "failed to develop" the facts

under § 2254(e)(2)'s opening clause. *Id.* "In that circumstance, an evidentiary hearing is not barred by § 2254(e)(2)." *Id.* On the other hand, if the prisoner was not diligent in attempting to develop the factual basis of his claims at the relevant stages in the state proceeding, "an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2). *Id.* at 430.

Here, Saterstad asserts that he requested a hearing in the state court, but his request was denied. *Doc. 52* at 76. Based on that assertion, we will assume that Saterstad was diligent in attempting to develop the factual basis of his claim in the state proceedings, and, thus, he did not fail to develop the facts under § 2254(e)(2)'s opening clause. As such, an evidentiary hearing is not barred by § 2254(e)(2). But the fact that § 2254(e)(2) does not bar an evidentiary hearing, does not establish that Saterstad is entitled to an evidentiary hearing. *Glunt,* 667 F.3d at 406. Rather, "the decision to grant such a hearing rests in the discretion of the district court." *Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010). And in exercising that discretion, the court must consider: "(i) 'whether the petition presents a *prima facie* showing which, if proven, would enable the petitioner to prevail on the merits of the asserted claim,' and (ii) whether the relevant factual allegations to be proven at the evidentiary hearing are 'contravened by the existing record' or the record 'otherwise precludes habeas relief.'" *Glunt,* 667 F.3d at 406-

407 (quoting *Palmer*, 592 F.3d at 393 (internal quotation marks and citations omitted)).

Here, Saterstad has not presented a *prima facie* showing, which, if proven, would entitle him to relief on the merits.  He has not alleged that he has any facts to present at a hearing as to the contents of S.C.'s school records or as to whether Judge Lewis received and reviewed those records.  It appears, instead, that he wants an evidentiary hearing to discover whether there are any facts supporting his claim.  But that is not the purpose of an evidentiary hearing.  "[A]n evidentiary hearing is not a fishing expedition." *Banks v. Workman*, 692 F.3d 1133, 1144 n.4 (10th Cir. 2012).  "Instead, its function is to resolve disputed facts." *Id.; see also Lenz v. Washington*, 444 F.3d 295, 304 (4th Cir. 2006) ("An evidentiary hearing is not a fishing expedition for facts as yet unsuspected, but is instead an instrument to test the truth of facts *already alleged* in the habeas petition.") (internal quotation marks and citation omitted).  As Saterstad has not suggested that he has any facts to present at an evidentiary hearing, he is not entitled to such a hearing.  And he has not shown that Lock was ineffective with respect to S.C.'s school records.

### B. Claim 12.

In Claim 12, Saterstad contends that because the evidence was insufficient to sustain a conviction, Lock was ineffective by failing to file a motion for judgment

of acquittal. Judge Lewis did, however, consider the sufficiency of the evidence and concluded that there was sufficient evidence to convict Saterstad. And, as discussed above, Judge's Lewis's decision in that regard was reasonable. Given that, we cannot say that Lock was ineffective by failing to file a motion for judgment of acquittal based on the sufficiency of the evidence.

## VIII. Recommendation.

For the foregoing reasons, **IT IS RECOMMENDED** that Saterstad's petition for a writ of habeas corpus be **DENIED**.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive

further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


Submitted this 25th day of  November, 2015.

> ***S/ Susan E. Schwab***
> Susan E. Schwab
> United States Magistrate Judge